HONORABLE ROBERT S. LASNIK

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| CURTIS ROOKAIRD,<br><br>Plaintiff,<br><br>v.<br><br>BNSF RAILWAY COMPANY, a Delaware Corporation,<br><br>Defendant | Court File No.: 14-CV-000176-RSL<br><br>**PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**Noted on Motion Calendar: July 17, 2015** |

## INTRODUCTION

Plaintiff Curtis Rookaird moves the Court for an order for partial summary judgment in his favor on the question of liability for his action against Defendant BNSF Railway Company ("the railroad") under the whistleblower protections of the Federal Rail Safety Act ("FRSA"), codified at 49 U.S.C. § 20109 and select affirmative defenses pled by the railroad.[1]

## EVIDENCE RELIED ON

Rookaird relies on the contemporaneously filed Declaration of Christopher W. Bowman in Support of Motion for Partial Summary Judgment ("Bowman Dec."); the exhibits thereto; the pleadings and records in this Court's file; and the argument and authorities contained herein.

---

[1] While Rookaird filed an earlier motion for Partial Summary Judgment (ECF No. 38), this Court ruled that the briefing in support of and in opposition to the instant motion shall not be limited by the briefing regarding the earlier motion. (ECF No. 89).



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

## STATEMENT OF FACTS & PROCEDURAL HISTORY

Plaintiff Curtis Rookaird began working for the railroad as a conductor in December 2004.[2] In late-February 2010—during the 2010 Winter Olympics in Vancouver—Rookaird was working a second-shift job in the Bellingham, Washington, area, where his primary responsibility was servicing various industries.[3] When he reported to work in the afternoon of February 23, Rookaird and his crew had planned to service customers, but were first asked by Trainmaster Dan Fortt to relocate a cut of cars from Custer and place them on the tracks off of Valley View Road.[4] The cut in question was a 42-car consist, consisting primarily of placarded hazardous tank cars, and had been left on the main line by a previous crew who did not have room to move them to a storage track.[5]

The engines for the move were located in Ferndale, just south of Custer, so Rookaird and his crew took a transport van to pick up the engines.[6] Prior to leaving for Ferndale, Rookaird contacted the dispatcher to obtain new general track bulletins so the crew would have authority to operate on the main line south of Ferndale if needed.[7] The crew arrived in Ferndale at 4:05 p.m., and left for Custer in the engines approximately 20 minutes later.[8] Prior to departing with the 42-car consist that his crew had been asked to place on the storage track, Rookaird performed air testing on the cars, consistent with his training.[9]

While Rookaird was testing the air brakes on the consist, Fortt contacted him via the radio and asked what they were doing; when Rookaird responded that they were performing an air test, Fortt responded that "they didn't do that" where he was from.[10] The crew eventually

[2] Bowman Dec., Ex. C, pg. 61:17-20.
[3] Bowman Dec., Ex. C, pg. 84:10-20, 85:15-23, 93:15-19.
[4] Bowman Dec., Ex. C, pg. 100:2-21.
[5] Bowman Dec., Ex. C, pg. 100:22-101:21.
[6] Bowman Dec., Ex. C, pg. 102:20-23.
[7] Bowman Dec., Ex. C, pg. 103:7-104:9.
[8] Bowman Dec., Ex. C, pg. 116:13-22.
[9] Bowman Dec., Ex. C, pg. 122:3-16.
[10] Bowman Dec., Ex. C, pg. 123:13-124:6. *See also* Bowman Dec., Ex. J, pg. 77:7-78:4. Rookaird testified that the crew was halfway through performing the test when this radio communication occurred. *Id.* at 125:6-10.



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

received a second radio communication from Fortt, instructing them to simply tie the consist down on the main line at the Valley tracks and leave it for another crew to put away.[11] Rookaird and his crew returned to Swift in the van at approximately 7:50 p.m., based on instructions from Fortt to return to Swift instead of proceeding to Cherry Point to service customers.[12]

On returning to Swift, Assistant Terminal Superintendent Stu Gordon asked Rookaird why he air tested the cars, and Rookaird responded that he was taking the safe course and acting in accordance with his training.[13] When Rookaird informed Gordon and Fortt that he and his crew had not been able to service their normal customers because they had been assigned work left undone by other crews, Gordon instructed Rookaird to "tie up," and Rookaird complied with that instruction.[14] Rookaird attempted to sign his time sheet, but was unable to locate the printed copy.[15]

After completing his time ticket, Rookaird went to break room to eat.[16] While in the break room, Rookaird saw fellow railroad employee Ron Krich and asked him why he was on company property based on Rookaird's belief that Krich was not sufficiently rested under the hours of service law.[17] When Krich began to raise his voice, claiming that the railroad made him go over his hours of service and that it was none of Rookaird's business.[18] Gordon and Fortt entered the break room and Gordon told Rookaird to leave three times in rapid succession, yelling "Leave, Leave, Leave" while standing inches from Rookaird "like a drill sergeant."[19] Rookaird eventually left the property at 8:20 p.m., approximately two hours before his shift was scheduled to end.[20]

---

[11] Bowman Dec., Ex. C, pg. 125:20-126:24.
[12] Bowman Dec., Ex. C, pg. 130:25-131:12, 133:13-15.
[13] Bowman Dec., Ex. C, pg. 134:19-24.
[14] Bowman Dec., Ex. C, pg. 138:1-139:9. "Tying up" is a process where a railroad employee logs onto a computer using their unique employee number and password and submits a time ticket. *See id.*, pg. 139:10-14.
[15] Bowman Dec., Ex. C, pg. 139:23-140:11.
[16] Bowman Dec., Ex. C, pg. 142:15-24.
[17] Bowman Dec., Ex. C, pg. 147:16-149:10.
[18] Bowman Dec., Ex. C, pg. 149:15-17, 150:19-23.
[19] Bowman Dec., Ex. C, pg. 153:25-154:22.
[20] Bowman Dec., Ex. C, pg. 165:16-22.



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

On February 26, 2010, the railroad issued Rookaird an investigation notice for allegedly failing to work efficiently during his shift, dishonestly reporting his off-duty time, failing to provide a signed tie-up slip, and failing to comply with instructions to leave.[21] The notice also advised Rookaird that he was withheld from service pending the investigation.[22] The railroad held an investigation on March 10.[23] Following its investigation, the railroad determined that Rookaird acted in violation of various railroad rules—specifically GCOR 1.13, 1.29, 1.6, 1.9, and GN Northwest Division #6—and terminated Rookaird's employment.[24] The other two members of Rookaird's crew received 30-day record suspensions with either a one- or three-year probationary period.[25]

Rookaird filed a complaint with the Department of Labor on June 23, 2010, on the basis that the railroad's termination of his employment was in violation of the FRSA's whistleblower protections.[26] In January 2013, OSHA completed its investigation and found that the railroad had acted in violation of the federal statute, awarding damages and directing that Rookaird be reinstated immediately.[27] Both parties filed objections to various provisions in the order and appealed the matter to the Office of Administrative Law Judges. More than 210 days having passed without a final decision from the Secretary of Labor, Rookaird exercised his right to bring this action in Federal Court, filing his complaint on February 4, 2014.[28]

---

[21] Bowman Dec., Ex. A.
[22] *Id.*
[23] *See, generally*, Bowman Dec., Ex. E.
[24] Bowman Dec., Ex. F.
[25] Bowman Dec., Ex. P (Webb Discipline Letter), Ex. Q (Belanger Discipline Letter).
[26] *See* Bowman Dec., Ex. G.
[27] Bowman Dec., Ex. H. To date, the railroad has refused to abide by the Secretary's unequivocal reinstatement order, despite the clear direction that such reinstatement is "not stayed by an objection to [the] order." *See also* 29 C.F.R. § 1982.106(b) (stating that preliminary reinstatement orders are effective immediately, regardless of any objections to the order). Rookaird's motion to enforce the reinstatement order is currently pending before this Court. (ECF No. 80).
[28] ECF No. 1. *See also* 49 U.S.C. § 20109(d)(3) (providing for Federal Court jurisdiction).



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

## ARGUMENT AND AUTHORITY

### I. Legal Standard

#### a. Summary Judgment

Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). A fact is material if it may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). In order to survive a motion for summary judgment, the adverse party must present "affirmative evidence," which "is to be believed" and from which "all justifiable inferences are to be drawn in [its] favor." *Id.* at 255-57, 106 S. Ct. at 2513-14. But the existence of a mere scintilla of evidence in support of the non-moving party's position is not sufficient to survive a motion for summary judgment unless a reasonable jury, when viewing the evidence in the light most favorable to the non-moving party, could return a verdict in its favor. *U.S. v. Arango*, 670 F.3d 988, 992 (9th Cir. 2010).

#### b. FRSA Burden-Shifting Framework

The FRSA's whistleblower protections incorporate the procedures enacted by the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21"), which contains whistleblower protections for employees in the aviation industry. *See* 49 U.S.C. § 42121(b) (AIR-21 procedures); *see also* 49 U.S.C. § 20109(d)(2)(A) (providing generally that FRSA whistleblower actions "shall be governed under the rules and procedures set forth in section 42121(b)"). To prevail, an FRSA plaintiff must establish by a preponderance of the evidence that: (1) he engaged in a protected activity, as defined by statute; (2) that the railroad knew about the protected activity; (3) that he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable personnel action. *Araujo v. New Jersey Transit Rail Ops., Inc.*, 708 F.3d 152, 157-58 (3rd Cir. 2013) (discussing AIR-21 burden shifting and concluding that it "[u]nquestionably" applies to cases brought under the FRSA"). After an FRSA plaintiff makes this showing, "the burden shifts to the employer to



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

demonstrate by *clear and convincing evidence* that the employer would have taken the *same* unfavorable personnel action in the absence of that behavior." *Id.* at 157 (quotations omitted) (emphasis added).

The Administrative Review Board has recently stressed that these two steps must not be merged; a railroad's assertion of a clear and convincing non-retaliatory reasons for its adverse action "may *not* be weighed against an employee's showing of contributing factor." *Powers v. Union Pac. R.R. Co.*, ARB 13-034 (ARB March 23, 2015). Put another way, the first step of the process must not be contaminated by the second step. Rookaird's proof that his engaging in protected activity played any part in bringing about his termination cannot be offset or undercut by the railroad's suggestion that it would have terminated him anyway; the veracity of the railroad's argument simply has no relevance to the question of whether Rookaird has satisfied the contributing-factor element.

When considering the contributing-factor element, it is important to note that this standard is "much easier for a plaintiff to satisfy" and "much more protective of plaintiff-employees" than many other employment statutes. *Araujo*, 708 F.3d at 158-59. Unlike the more stringent "motiviating" or "substantial" factor standards applied by other statutes, caselaw has defined a contributing factor to be "any factor which, *alone or in connection with other factors*, tends to affect in *any way* the outcome of the decision." *Id.* at 158 (quotation omitted) (emphasis added). Put another way, "[c]ausation or 'contributing factor' in a FRSA whistleblower case is not a demanding standard." *Hutton v. Union Pac. R.R. Co.*, ARB 11-091, pg. 7 (ARB May 31, 2013). Intended to overrule existing caselaw that required a higher showing, the contributing-factor standard may be satisfied on a showing that the railroad's offered rationale for the protected activity "while true, is only one of the reasons for its conduct, and another [contributing] factor is the complainant's protected activity." *Id.* at pg. 5; *see also Araujo*, 708 F.3d at 158 (discussing rationale behind contributing-factor standard).

When the burden shifts to the railroad, however, the standard of proof and causal connection changes. The railroad must establish not only that it could have or was permitted to impose the adverse action, but that it *would* have taken the *same* action absent protected activity.



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

*See Araujo*, 708 F.3d at 159. In discussing the Energy Reorganization Act, 42 U.S.C. § 5851—a statute that employs a markedly similar burden-shifting framework to the one used in FRSA litigation—the Eleventh Circuit noted "[f]or employers, this is a tough standard, and not by accident." *Stone & Webster Eng'g Corp. v. Herman*, 115 F.3d 1568, 1572 (11th Cir. 1997). "The Eleventh Circuit stated that the standard [under Section 5851] is 'tough' because Congress intended for companies in the nuclear industry to face a *difficult time defending themselves*, due to a history of whistleblower harassment and retaliation in the industry." *Araujo*, 708 F.3d at 159 (quotation omitted) (emphasis added). Federal Circuit Courts have adopted the same construction of the 2007 amendments to the FRSA "due to the history surrounding their enactment." *Id.*; *see also Powers*, 2015 WL 1607343 at *11 n.3 ("The 2007 amendment to the FRSA was enacted against a backdrop of findings by Congress of extensive retaliation against injured railway employees, and under-reporting of injuries by the nation's railroad companies, and these congressional findings have been fully noted in federal court and agency precedent.").

## II. No genuine issue of material fact exists as to the question of liability, and Rookaird is therefore entitled to an entry of judgment as a matter of law on liability under the FRSA.

### *a. Comprehensive review of the record in this case leaves no genuine issue of material fact as to whether Rookaird has established his prima facie case.*

As discussed above, Rookaird establishes a prima facie case under the FRSA if he can show by a preponderance of the evidence that (1) he engaged in a protected activity, as defined by statute; (2) that the railroad knew about the protected activity; (3) that he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable personnel action. *See Araujo*, 708 F.3d at 157 (establishing essential elements of FRSA claim). No genuine issue of material fact exists as to any of these questions, and Rookaird is therefore entitled to summary judgment in his favor on his prima facie case.

#### *i. Rookaird engaged in protected activity*

The FRSA includes protections for when an employee notifies a railroad carrier of a work-related personal injury. 49 U.S.C. § 20109(a)(4) (prohibiting discrimination due to an employee's good-faith act done to notify or attempt to notify either the railroad or the Secretary of Transportation of a work-related personal injury or illness). Here, it is undisputed that



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

Rookaird suffered a reportable injury when he suffered a meniscus tear in his right knee in March 2009, resulting in him missing approximately seven months of work.[29] Both of these injuries were reported to the railroad.[30]

In addition, the statute provides protections for railroad employees who "refuse to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security." 49 U.S.C. § 20109(a)(2). Federal safety regulations require that a train's brakes are tested before certain types of movements are performed. One such type of test is called a "transfer train"[31] brake test, which requires that a brake test consisting of coupling air brake hoses between all cars, charging the brake system to at least 60 psi, and inspecting to determine that brakes on each individual car apply. 49 C.F.R. § 232.215. In adopting the regulation governing when a transfer-train brake test be performed, the FRA has indicated that "the decision as to whether a particular consist is subject to the transfer train inspection requirements is primarily based on a determination that the movement the train is engaged in is considered a 'train movement' rather than a 'switching movement.'" 66 FR 4104-01, 4148, Jan. 17, 2001.

The FRA adopted a rule of thumb that a "train movement" requires (1) five or more cars coupled together (2) that are hauled a distance of at least one mile (3) without a stop to set off or pick up a car and (4) not moving for the purpose of assembling or disassembling a train. *Id.* at 4148-49. In conducting its official analysis of whether a movement constitutes a "train movement", the FRA is guided by a multi-factor test based on relevant caselaw, considering (1) the purpose of the movement, (2) the distance traveled without a stop to set off or pick up cars, (3) the number of cars hauled, and (4) the hazards associated with the particular route traveled, such as the existence of public or private crossings with or without crossing protection. *Id.* at 4149, citing *United States v. Seaboard Air Line R.R. Co.*, 361 U.S. 78 (1959); *Louisville &*

---

[29] Bowman Dec., Ex. C., pg. 77:22-80:12. Rookaird also suffered a non-reportable injury to his ankle a few years prior to the railroad's termination of his employment. *Id.* at 81:1-83:18.

[30] Bowman Dec., Ex. C, pg. 79:7-80:8 (discussing settlement of reportable injury), pg. 81:20-24 (discussing notification of non-reportable injury).

[31] A transfer train is defined as "a train that travels between a point of origin and a point of final destination not exceeding 20 miles." 49 C.F.R. § 232.5.



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

*Jefferson Bridge Co. v. United States*, 249 U.S. 543 (1919). "The existence of *any* of these hazards would tend to weigh towards the finding of a 'train movement.'" *Id.* (emphasis added).

Here, the consist on which Rookaird and his crew did the air brake testing consisted of 42 cars.[32] There is no allegation that the movement in question stopped to pick up or set out a car, nor that it was made for the purpose of assembling or disassembling a train. Rather, the purpose for the movement was to remove the consist from the siding and placing it on storage tracks. Nor is there any dispute that the distance of the movement exceeded one mile (while being less than 20 miles). Furthermore, it is undisputed that the path on which the movement would take place included traversing multiple public grade crossings and entering a portion of mainline track on which at least four passenger trains travelled on a daily basis.[33] The movement therefore clearly should be considered a "train movement" and therefore was subject to the mandatory brake testing under 49 C.F.R. § 232.215.

Even if the movement was not considered a "train movement," however, the railroad has "empowered" its employees to "take the safe course."[34] And indeed, one of the first rules of the railroad's General Code of Operating Rules (GCOR) directs: "In case of doubt or uncertainty, take the safe course."[35] In light of the hazards posed by the tracks on which the consist was scheduled to move, as well as the fact that the consist itself was made up primarily of placarded tank cars, Rookaird and his crew took the safe course in performing the air brake testing on the train, ensuring that it was safe to proceed, consistent with their training and the railroad's "most important element" of safety.[36] In light of the fact that the 42-car consist was engaged in a train movement and subject to the mandatory air brake testing articulated in 49 C.F.R. § 232.215—or, even if it wasn't, the railroad's rules purport to "empower" Rookaird to take the safe course of

---

[32] Bowman Dec., Ex. C, pg. 100:22-101:21.
[33] Bowman Dec., Ex. C, pg. 122:17-25; Bowman Dec., Ex. J, pg. 28:24-29:8; Bowman Dec., Ex. M, pg. 51:14-18, 111:9-11.
[34] Bowman Dec., Ex. C, pg. 241:14-242:4.
[35] Bowman Dec., Ex. I (Rule 1.1.1). *See also* Bowman Dec., Ex. N, pg. 36:8-13.
[36] *See* Bowman Dec., Ex. C, pg. 122:11-16, 134:19-24; *see also* Bowman Dec., Ex. I (Rule 1.1).



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

action—Rookaird's action in conducting the air brake test may unquestionably be considered a refusal to violate a Federal law, rule, or regulation related to railroad safety.

Several unavoidable conclusions become clear. First, Rookaird notified the railroad of work-related personal injuries on two separate occasions. Second, the 42-car consist was a transfer train subject to the mandatory air brake testing prescribed by 49 C.F.R. § 232.215. Third, Rookaird was trained to always take the safe course, especially when there was any doubt. Fourth, consistent with his training and his understanding of the applicable rules, Rookaird performed an air brake test on the consist over his supervisor's objections. When these facts are considered, even when viewed in the light most favorable to the railroad, there is no genuine dispute of material fact that Rookaird engaged in protected activity under the FRSA, and he is entitled to summary judgment as a matter of law on this element of his claim.

*ii. The railroad was aware that Rookaird engaged in protected activity*

With regard to Rookaird's on-the-job injuries, it is beyond dispute that the railroad was aware that he had notified the railroad of his injuries. Rookaird testified consistently and clearly in his deposition that he discussed the March 2009 injury with a railroad claim agent, and ultimately settled his injury claim with the railroad for $75,000.[37] With regard to the earlier injury, Rookaird testified that he reported the injury to his supervisor and, while he could not remember with complete confidence, may have also provided a written statement.[38] The testimony that Rookaird notified the railroad of his injuries—and therefore that the railroad had knowledge of Rookaird's protected activity—was clear, unequivocal, and uncontroverted. Furthermore, the executive summary that was provided to the PEPA Board in "reviewing" Rookaird's termination clearly notes that Rookaird had a reportable injury on his record.[39]

Nor is there any dispute that the railroad knew that Rookaird was performing the air brake test. Fortt contacted Rookaird over the radio and questioned why he was performing the

---

[37] Bowman Dec., Ex. C., pg. 79:7-80:8.
[38] Bowman Dec., Ex. C., pg. 81:20-24.
[39] *See* Bowman Dec., Ex. D; *see also, generally,* Bowman Dec., Ex. R, pg. 133:21-160:18 (discussing exhibit).



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

air brake test.[40] On the crew's return to Swift, Gordon approached and asked why Rookaird had air tested the cars.[41] Neither Fortt nor Gordon dispute that these conversations took place. Any argument that the railroad may offer that it somehow was not aware of the fact that Rookaird conducted an air brake test is wholly unavailing.

Because the undisputed evidence establishes that the railroad was aware that (1) Rookaird had notified the railroad of two separate work-related injuries and (2) Rookaird had insisted on conducting an air brake test of the consist, Rookaird is entitled to summary judgment on the employer-knowledge element of his FRSA claim.

*iii. Rookaird suffered an unfavorable personnel action*

In response to Requests for Admissions, the railroad admitted that it terminated Rookaird's employment.[42] The railroad has also admitted that the "termination constitutes an unfavorable personnel action within the meaning of 49 U.S.C. § 42121(b) and the FRSA."[43] "A matter admitted under [Fed. R. Civ. P. 36] is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). As no such motion has been granted, the record "conclusively establishe[s]" that Rookaird suffered an unfavorable personnel action, as that term is used in FRSA whistleblower litigation.[44] Rookaird is therefore entitled to judgment as a matter of law on this element of his claim.

---

[40] Bowman Dec., Ex. C, pg. 123:22-124:6.
[41] Bowman Dec., Ex. C, pg. 134:19-24.
[42] *See* Bowman Dec., Ex. B, pg. 8.
[43] *Id.*, pg. 9.
[44] The record also contains no genuine issue of material fact that the railroad issued an investigation notice to Rookaird, held Rookaird out of service pending the investigation, and in fact held a multiple hour investigation into charges of alleged rule violations. While perhaps not as significant as the railroad's ultimate action of terminating Rookaird's employment, these actions nonetheless do constitute unfavorable personnel actions giving rise to a possible whistleblower claim under the FRSA. *See, e.g., Vernace v. Port Authority Trans-Hudson Corp.*, ARB 12-003, slip op. at pg. 2-3, 2012 WL 6849446 at *1-2 (ARB Dec. 21, 2012) (finding that "the broad and plain language of the [FRSA] and regulations" includes letters initiating an investigation as satisfying the adverse-action element of an FRSA claim.



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

*iv. Rookaird's protected activity—either alone or in combination with other factors—played some role in causing his termination.*

As discussed above, the contributing-factor standard is a relatively low causation analysis. *See, e.g., Hutton*, ARB 11-091 at pg. 7 ("Causation or 'contributing factor' in a FRSA whistleblower case is not a demanding standard"). Indeed, caselaw makes abundantly clear that a plaintiff may meet this burden by circumstantial evidence, which may include temporal proximity, indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward the complainant after he or she engages in protected activity. *DeFrancesco v. Union Pacific R.R.*, ARB No. 10-114, slip op. at 3, 2012 WL 694502 at *3 (ARB Feb. 29, 2012).

Here, the record evidence unquestionably satisfies this burden. During the railroad's investigation, the railroad presented evidence that it questioned the necessity of conducting the air test.[45] When asked to provide information to show that any member of Rookaird's crew had violated the railroad's rule prohibiting unnecessary delays, the railroad's witness was unable to cite a single thing that the crew did that could be deemed an unnecessary delay, other than the performance of an air test that he considered to be irrelevant.[46] The fact that railroad management aggressively challenged Rookaird on the necessity of the air brake testing is further evidence that it played some part—even if it were not the sole or even motivating factor—in noticing the investigation and the eventual termination of Rookaird's employment. *See id.* (noting that "antagonism or hostility toward a complainant's protected activity" may be sufficient to satisfy the contributing-factor element of an FRSA claim).

The railroad attempts to circumvent this unavoidable conclusion by suggesting that its allegation that Rookaird wasn't moving expeditiously "was the whole process of what he was doing . . . [a]nd it was not only that day but it was a number of days he was working like that."[47]

---

[45] Bowman Dec., Ex. E, pg. 60.
[46] *Id.*
[47] Bowman Dec., Ex. M, pg. 102:18-103:3.



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

But if the railroad *did* take issue with Rookaird's work for "a number of days" prior to February 23, 2010, the fact that it did not pull him from service pending investigation, hold an investigation, and terminate his employment until *the day* that he engaged in the statutorily protected activity of complying with the FRA's air-test regulations is significant. *See DeFrancesco*, 2012 WL 694502 at *3 (stating that "a change in the employer's attitude toward the complainant after he or she engages in protected activity" is circumstantial evidence that the protected activity was a contributing factor of the adverse action); *see also Araujo*, 708 F.3d at 160 (noting that temporal proximity between the engagement in protected activity and the unfavorable personnel action can be circumstantial evidence to satisfy the contributing-factor element).

When the evidence is viewed in its entirety, no reasonable juror could find that Rookaird's protected activity had absolutely no effect in any way on the railroad's decision to withhold him from service, hold an investigation, and eventually terminate his employment. The antagonism with which railroad officials reacted to Rookaird's conducting the air test, the irrefutable change in the railroad's attitude toward Rookaird, and the temporal proximity between the air test and the adverse actions are more than sufficient to carry this burden. Rookaird is therefore entitled to summary judgment on this element of his FRSA claim.

*b. The railroad cannot meet its burden that it* would *have terminated Rookaird even in the absence of his protected activity.*

The railroad bears the burden of persuasion on its statutory defense that clear-and-convincing evidence establishes that it would have terminated Rookaird even in the absence of Rookaird's protected activity. *See* 49 U.S.C. §§ 42121(b)(2)(B)(ii) (discussing employer's burden); 20109(d)(2)(A)(i) (referencing AIR-21 as establishing burden of proof in FRSA actions). Rookaird is therefore entitled to summary judgment on this question by either (1) submitting affirmative evidence that negates an essential element of the railroad's claim *or* (2) demonstrating that the railroad's evidence is insufficient to establish an essential element of its claim. *See Celotex Corp.*, 477 U.S. at 331, 106 S. Ct. at 2557 (discussing summary judgment where nonmoving party bears burden of persuasion at trial). A comprehensive view of the record evidence in the present case—even when viewed in the light most favorable to the



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

railroad—reveals that whatever evidence the railroad may purport to have on this issue is insufficient to meet its burden.

First, the depositions in this case contain numerous references to the railroad's assertion that when terminations, such as Rookaird's, are reviewed, the railroad would review the termination ostensibly to "make sure that [it] was appropriate" under the railroad's PEPA policy.[48] In the words of the railroad's General Director of Labor Relations, his review of terminations involved "look[ing] at the discipline policy" and "mak[ing] sure thawt the employee's record qualifies the employee for dismissal"; if so, the railroad would proceed with the termination.[49]

This may be a sufficient showing under a *McDonnell Douglas* burden-shifting statute. *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (discussing an employer's burden under the analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*). But unfortunately for the railroad, caselaw conclusively establishes that a showing of a legitimate, non-discriminatory reason for its actions is *not* sufficient to carry its burden under the FRSA. *See Araujo*, 708 F.3d at 162 (noting that application of *McDonnell Douglas* burden-shifting framework to an FRSA claim may lead to a result more favorable to the railroad). Put another way, the railroad cannot avoid liability simply by showing that it had a legitimate business reason for terminating Rookaird's employment. *See Barker v. Ameristar Airways, Inc.*, No. 05-058, 2007 WL 4623496, at *6 (ARB Dec. 31, 2007) (concluding that AIR-21's burden-shifting framework requires more than clear and convincing evidence that the employer had legitimate business reasons for its actions and rejecting the ALJ's reliance on *McDonnell Douglas*).

Here, the railroad had the ability to review the rules which Rookaird was accused of violating to determine that they were being applied consistently and uniformally—in other words, that the railroad *would* have terminated Rookaird even in the absence of protected

---

[48] *See, e.g.*, Bowman Dec., Ex. L, pg. 38:6-12.
[49] Bowman Dec., Ex. L., pg. 61:20-62:6; *see also* Bowman Dec., Ex. R, pg. 29:17-30:1.



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

activity; it elected not to do so.[50] When asked how the railroad knows that the rules are being consistently applied, the railroad's General Director of Labor Relations testified (over defense counsel's objection): "I guess I'm not sure. I mean, I guess it's always possible that they're not."[51] Ringstad also admitted under oath that violation of the rule that Rookaird stood accused of could result in a *variety* of types of discipline.[52] And indeed, comparator data produced through deposition testimony establishes that employees who stood accused of violating the same rules for which Rookaird's employment was terminated were subjected to a wide variety of discipline.[53]

Perhaps most jarringly, Robert Johnson, who was then the General Director of Transportation for the railroad's Northwest Division and was the conducting officer for the railroad's investigation of Rookaird and his crew stated in an e-mail sent to railroad management as follows:

> I am not going to tell you this crew was the only crew that played the slow down game! However, I will tell you that this crew made a fatal mistake *and we have to make an example out of them*. To put this in perspective, the behavior displayed in this move severely impacted BNSF in our customer's eyes and we have to ensure it doesn't happen again.[54]

This e-mail belies any claim by the railroad that it would have taken the same action against Rookaird even in the absence of his decision to test the air brakes on the cars—the railroad did what it did to "make an example of Rookaird and his crew."

Even when the evidence is viewed in the light most favorable to the railroad as the non-moving party, there are simply too many holes in the railroad's story for a reasonable jury to find that the railroad has established—by *clear and convincing evidence*—that it *would* have

---

[50] Bowman Dec., Ex. L, pg. 37:22-38:5, 63:16-25.
[51] Bowman Dec., Ex. L, pg. 48:20-49:2.
[52] Bowman Dec., Ex. L, pg. 50:23-51:3.
[53] *See, e.g.*, Bowman Dec., Ex. M, pg. 123:14-130:16.
[54] Bowman Dec., Ex. O (emphasis added); *see also* Bowman Dec., Ex. L, pg. 69:12-77:13 (discussing the exhibit). Despite the railroad's representation that Rookaird's actions "severely impacted BNSF in [its] customers eyes," the railroad has not been able to point to a single complaint from any of its customers for the relevant time period. *See* Bowman Dec., Ex. M, pg. 77:17-78:2, 107:19-25.



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

terminated Rookaird even in the absence of his statutorily protected activity. There is the fact that comparator data indicates that other employees—including the other two members of Rookaird's crew that day—were treated more favorably.[55] There is the fact that the railroad has admitted that violation of the rules could result in a range of discipline.[56] And there is the fact that the railroad sought to "make an example out of" Rookaird and his crew.[57] Because no reasonable jury could find that the railroad has met its burden, Rookaird is entitled to summary judgment on this question.

## III. Rookaird is entitled to summary judgment on various affirmative defenses pled by the railroad.

This Court has recognized that "[t]here is very little authority analyzing whether a party may move for summary judgment on an affirmative defense."[58] While not directly addressing the issue, Circuit Court authority does indicate that motions for summary judgment on affirmative defenses are appropriate. *See Ackerson v. City of White Plains*, 702 F.3d 15, 21 (2nd Cir. 2012), *as amended* (Dec. 4, 2012) (holding that the district court "should have granted [plaintiff's] motion for partial summary judgment on [defendants'] probable cause affirmative defense"). Indeed, while citing to the Second Circuit's *Ackerson* decision, this Court previously granted summary judgment on one of the railroad's affirmative defenses, concluding that the railroad's claim that this action is barred by the election-of-remedies language at 49 U.S.C. § 20109(f) "fails as a matter of law."[59] Rookaird now moves for summary judgment on additional affirmative defenses pled by the railroad in its answer.

### *a. Statute of Limitations*

The railroad suggests that portions of Rookaird's complaint "seek[] to pursue claims based upon acts which occurred more than 180 days before the filing of a complaint with the Occupation Safety and Health Administration" and therefore that "those claims are barred in

[55] Bowman Dec., Ex. M, pg. 112:8-12123:14-130:16; *see also* Bowman Dec., Exs. P, Q.
[56] Bowman Dec., Ex. L, pg. 50:23-51:3.
[57] Bowman Dec., Ex. O.
[58] ECF No. 75, pg. 3.
[59] *See* ECF No. 75 (granting Plaintiff's Motion for Partial Summary Judgment).



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

whole or in party by the applicable statute of limitations."[60] This claim has no basis in the undisputed facts in this case.

Rookaird's complaint seeks redress for four adverse-employment actions that violated the whistleblower protections of the FRSA; to wit, noticing an investigation, holding him out of service pending the investigation, conducting an investigation, and terminating his employment on or about March 19, 2010.[61] The earliest of the alleged adverse actions—noticing an investigation—occurred on or about February 26, 2010.[62] Under the FRSA's 180-day statute of limitations, Rookaird therefore had until August 25, 2010, to file a complaint with the Department of Labor. *See* 49 U.S.C. § 20109(d)(2)(A)(ii) (providing that FRSA whistleblower claims must be commenced by filing a complaint with the Secretary of Labor not later than 180 days after the adverse employment action occurs). Here, the railroad admits that Rookaird filed a complaint with the Department of Labor on July 23, 2010, more than a month *before* the statute of limitations expired.[63] The undisputed facts in this case render a statute-of-limitations defense wholly unavailing, and Rookaird is therefore entitled to summary judgment on the defense.

*b. Neutral Arbitration Board*

The railroad suggest that Rookaird's claims are "barred because a neutral arbitration board, which dealt adequately with all factual issues and consisted of fair and impartial proceedings, has upheld [Rookaird's] discipline."[64] In essence, this affirmative defense seeks to bestow preclusive effect on the Public Law Board's findings in this FRSA action, an argument squarely rejected by the Circuit Courts.

The Fifth Circuit's opinion in *Grimes v. BNSF Ry. Co.*, 746 F.3d 184 (5th Cir. 2014), is instructive here. In *Grimes*, the district court granted the railroad's motion for summary judgment, finding that a finding of fact made by a Public Law Board was entitled to collateral-estoppel effect in a subsequent FRSA action. 746 F.3d at 185. A unanimous panel for the Fifth

---

[60] ECF No. 13, pg. 6-7 (Affirmative Defense No. 2).
[61] ECF No. 1, pg. 4-5, ¶ 17.
[62] *See* Bowman Dec., Ex. A.
[63] *See* Bowman Dec., Ex. B, pg. 7.
[64] ECF No. 13, pg. 7 (Affirmative Defense No. 4).



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

Circuit vacated the summary-judgment award finding that the doctrine of collateral estoppel was inappropriate in this context because the PLB only reviewed the record from an investigation that was unquestionably conducted by the railroad. *Id.* at 188. "The fact that a subsequent panel of neutral arbitrators reviewed the record of the internal investigation and hearing and concluded that the railroad had reached the correct result is *not enough* to insulate the underlying, employer-conducted proceedings from scrutiny." *Id.* at 188-89 (emphasis added). While noting that—in that case—the employee was able to call and cross-examine witnesses and present evidence at the hearing, the fact that "it was the railroad that conducted the investigation and hearing and terminated [the employee], and because the PLB only reviewed a closed record, the procedures were not adequate for collateral estoppel to apply." *Id.* at 190.

Here, the railroad seeks to take the argument rejected by the Fifth Circuit in Grimes one step further, arguing not only for collateral estoppel, but actual claim preclusion. A trilogy of Supreme Court cases preclude application of the doctrine to bar the current action. In *McDonald v. City of West Branch, Mich.*, the employer argued that its terminated employee's federal-court claim was precluded because of a grievance arbitrator's finding that the termination was based on good cause. *See* 466 U.S. 284, 286, 104 S. Ct. 1799 (1984). The Supreme Court noted that it had twice before rejected similar arguments seeking to preclude their employees' employment claims based in federal statute. *Id.* at 288-89 (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974) and *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728 (1981)). "Congress intended the statutes at issue in those cases to be judicially enforceable and . . . arbitration could not provide an adequate substitute for judicial proceedings in adjudicating claims under those statutes." *McDonald*, 466 U.S. at 289.

Because the caselaw clearly establishes that the PLB determination does not have any preclusive effect on Rookaird's entirely separate FRSA action, Rookaird respectfully asks this Court to enter an order granting summary judgment in his favor on the pled defense.



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

*c. Failure to Mitigate*

Finally, the railroad argues that Rookaird's claims for damages are barred by his alleged failure to mitigate any such damages.[65] Rookaird had a duty to use reasonable diligence in mitigating his damages by finding other suitable employment. *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 231, 102 A. Ct. 3057, 3065 (1982) (discussing Title VII's duty to mitigate). While the duty to mitigate lies with the injured party, the burden of proving failure of that duty rests with the employer. *See Sangster v. United Air Lines, Inc.*, 633 F.2d 864, 868 (9th Cir. 1980), *cert.* denied, 451 U.S. 971 (1981). An employer satisfies this burden by proving "based on undisputed facts in the record, during the time in question there were substantially equivalent jobs available, which [the plaintiff] could have obtained, and that [the plaintiff] failed to use reasonable diligence in seeking one." *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 906 (9th Cir. 1994) (emphasis in original). Notably, the duty to mitigate does *not* require an employment-law plaintiff to "go into another line of work, accept a demotion, or take a demeaning position." *Ford Motor Co.*, 458 U.S. at 231, 102 S. Ct. at 3065. "[The] claimant's burden is *not* onerous, and does *not* require him to be successful in mitigation." *Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614, 624 (6th Cir. 1983) (emphasis added), *cert. denied*, 466 U.S. 950 (1984); *see also Nat'l Labor Relations Bd. V. Mercy Peninsula Ambulance Serv.*, 589 F.2d 1014, 1018 (9th Cir. 1979) ("A discharged worker is not held to the highest standard of diligence in his or her efforts to secure comparable employment; 'reasonable' exertions are sufficient."). Here, the railroad cannot establish that Rookaird failed to fulfil this obligation.

Even before his termination was final, Rookaird began attempting to mitigate his damages, both by commencing this action by filing a complaint with the Secretary of Labor and by challenging the termination as violating the collective bargaining agreement between the railroad and Rookaird's union.[66] He has made repeated attempts through his attorneys to seek

---

[65] ECF No. 13, pg. 8 (Affirmative Defense No. 13).

[66] This court has previously rejected the railroad's argument that this action was precluded by the FRSA's election of remedies provision—49 U.S.C. § 20109(f)—as a result of his challenge to the termination under the CBA through his union. *See* ECF No. 75.



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

reinstatement to his job with the railroad, including filing a motion with this Court for enforcement of the Department of Labor's reinstatement order.[67]

Furthermore, the railroad has presented *no* evidence as to the availability of comparable employment or that Rookaird failed to use reasonable diligence in finding such employment. This fact alone is sufficient to negate a failure-to-mitigate defense. As noted by the Ninth Circuit, no authority exists for the proposition that "if an employer proves that a plaintiff failed to look for work, the employer is not required to prove that jobs were available." *See Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1496-97 (9th Cir. 1995) (affirming district court's determination that employer failed to meet its burden of proving a failure-to-mitigate defense when no evidence of comparable employment was proffered).

But even if such a rule *did* exist, the railroad has not established that Rookaird failed to look for work. *See id.* at 1497 (conducting similar analysis). Following the railroad's termination of his employment, Rookaird applied for a job with Amtrak.[68] He applied for a position with Boeing shortly immediately after his termination, completing a drug test and a physical.[69] With a position with the company all but offered to him, Boeing learned of Rookaird's pending case before the Public Law Board and stopped considering him as a candidate, not wanting to spend the time training him if he were going to be reinstated with the railroad.[70] After the Public Law Board denied his appeal, Rookaird reapplied to Boeing several times, but was not offered a position.[71] In November 2011, he received a Commercial Driver's License, and shortly thereafter began working for Hamm & Phillips.[72] While working for Hamm & Phillips, he was forced to spend significant time away from his wife and children, servicing oil fields in North Dakota.[73] In August 2013, he began working for Lee & Estates Tank Lines—

---

[67] *See* ECF No. 80.
[68] Bowman Dec., Ex. C, pg. 29:7-11.
[69] Bowman Dec., Ex. C, pg. 40:13-16, 42:4-10.
[70] Bowman Dec., Ex. C, pg. 40:16-41:2; Bowman Dec., Ex. K, pg. 35:9-18.
[71] Bowman Dec., Ex. C, pg. 43:14-44:14. The fact that Rookaird's
[72] Bowman Dec., Ex. C, pg. 38:1-22.
[73] Bowman Dec., Ex. C, pg. 39:1-40:9; Bowman Dec., Ex. K, pg. 45:17-22.



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

delivering gasoline to gas stations, bulk plants, and airports—a position he holds today.[74] In addition to his considerable efforts to rejoin the work force, Rookaird and his wife engaged in efforts to try and keep their home from going into foreclosure, including working with their representatives in the United States Senate.[75]

The record is wholly devoid of any evidence that Rookaird failed to use reasonable diligence in seeking alternative employment. Not only that, but the record is replete with evidence of Rookaird's considerable efforts to do so, even going so far as to spend weeks at a time away from his family at considerable expense to find work. Rookaird is therefore entitled to summary-judgment dismissal of the railroad's pled failure-to-mitigate affirmative defense.

## CONCLUSION

For the reasons stated herein, Rookaird respectfully asks that this Court enter an order granting summary judgment in Rookaird's favor on all questions of liability, as well as the railroad's asserted defense that Rookaird failed to mitigate his damages, and direct that this matter proceed to a trial solely on the question of damages, including but not limited to punitive damages. In the alternative, Rookaird respectfully asks that this Court enter summary judgment in Rookaird's favor on his prima facie case for violations of the FRSA's whistleblower protections and the three affirmative defenses addressed above, and award whatever further relief this Court finds just and proper.

Respectfully Submitted,

Dated: June 25, 2015

YAEGER & JUNGBAUER BARRISTERS, PLC

By: */s/ Christopher W. Bowman*
William G. Jungbauer, admitted *pro hac vice*
Christopher W. Bowman, admitted *pro hac vice*
4601 Weston Woods Way
Saint Paul, MN 55127
Telephone: (651) 288-9500
Facsimile: (651) 288-0227
wjungbauer@yjblaw.com
cbowman@yjblaw.com

[74] Bowman Dec., Ex. C, pg. 31:21-32:10.
[75] Bowman Dec., Ex. K, pg. 33:22-34:5

-and-

Bradley K. Crosta, WSBA #10571
CROSTA & BATEMAN
999 3rd Avenue, Suite 2525
Seattle, WA 98104-4032
Telephone: (206) 224-0900
Facsimile: (206) 467-8028
bcrosta@crostabateman.com

*Attorneys for Plaintiff Curtis Rookaird*



Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500