HONORABLE RICHARD A JONES

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| PAUL W. PARKER, as<br>Personal Representative for the<br>Estate of Curtis John Rookaird,<br><br>                              Plaintiff,<br><br>     v.<br><br>BNSF RAILWAY COMPANY,<br>a Delaware Corporation,<br><br>                              Defendant. | Court File No.: 14-CV000176-RAJ<br><br><br>**PLAINTIFF'S TRIAL BRIEF**<br><br><br>**Bench Trial Date: October 25, 2021** |

## INTRODUCTION

Defendant BNSF Railway Company removed Plaintiff Curtis Rookaird from service, subjected him to an investigation for "working inefficiently", and then terminated his employment immediately after Rookaird and his crew performed an air brake test over the question of his Supervisor Dan Fortt and his boss, Stuart Gordon.  Rookaird and his crew "took the safe course" they believed was necessary by conducting an air-brake test that BNSF appealed the decision to the Ninth Circuit, which rejected most of the railroad's arguments. The Ninth Circuit determined that the air-brake test was FRSA protected activity. *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 456

(9th Cir. 2018) ("We hold that the district court did not err in denying BNSF's motion for judgment as a matter of law with respect to whether Rookaird engaged in FRSA-protected activity."). The Ninth Circuit also held that Rookaird has satisfied his *prima facie* case in that the circumstances would raise the inference that the air-brake test was a contributing factor in Rookaird's termination.  *Rookaird*, 908 F.3d at 462 ("[T]here was no genuine dispute of material fact that the circumstances were sufficient to raise that the air-brake test was a contributing factor in Rookaird's termination."). The Ninth Circuit remanded for a new trial on the very limited issue of "whether Rookaird proved by a preponderance of the evidence that his refusal to stop performing the air-brake test was a contributing factor in his termination." *Id*. at 463. The Court also concluded that BNSF's affirmative defense to prove by *clear and convincing evidence* it *would* have fired Rookaird even if the absence of the air brake test, and damages should have been tried to the jury. [Dkt. No. 328 at pp. 3-4.]

## STATEMENT OF FACTS

Plaintiff Curtis Rookaird began working for the railroad as a conductor in December 2004. On February 11, 2010, BNSF changed the location of Rookaird's job from Bellingham, WA to Swift, WA to save time and money for BNSF.  Rookaird was working a second-shift job that began in Swift, WA.

BNSF's change of work location from Bellingham to Swift caused numerous unforeseen delays on occasions for different crews such as Rookaird's on February 23, 2010.  On that date, Rookaird and his crew were delayed from beginning their job by unforeseen problems with obtaining required documents and paperwork, obtaining proper authority for what they were

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

1    going to do, train lists, unforeseen change in location of locomotives they were to pick up,

2    unforeseen bad ordered car that had to be moved at Custer, and the necessity of performing an air

3    test on the 42 cars, 40 of which were hazmat placard cars at Custer, prior to going to Cherry Point.

4    When Rookaird and his crew got pass all of these unexpected delays and was performing the air

5    test at Custer, Trainmaster Dan Fortt contacted them by radio and questioned the necessity of

6    performing the air test at that location.  Fortt refused to discuss the matter on the radio with the

7    crew.  Fortt's boss, Stu Gordon, was talking to Fortt at that time and was monitoring the

8    conversation.  Gordon told Fortt to direct Rookaird and his crew to return to the Swift depot where

9    Gordon confronted them.  Gordon, Fortt, and other BNSF officials were under pressure at this

10   time because the new change of starting location was causing severe problems for BNSF in

11   getting customer's serviced since February 11, 2010.

12            When the crew arrived at Swift, Assistant Terminal Superintendent Stu Gordon asked

13   Rookaird why they performed an "unnecessary" air test on the hazmat the cars.  Rookaird

14   explained he was acting in accordance with his training and taking the safe course.  Rookaird then

15   informed Gordon and Fortt he and his crew still had to complete their work at Cherry Point.

16   Gordon told Rookaird and his crew to "tie up" (complete their day) and Rookaird complied with

17   that instruction by logging into the computer at 8:02 p.m. and listing his time of departure at 8:30

18   p.m., which is the ½ hour permitted by BNSF rules.  Rookaird attempted to sign his required time

19   sheet but could not locate the printed copy.

20            After completing his time ticket, Rookaird went to break room to eat. While in the break

21   room, Rookaird encountered fellow railroad employee Ron Krich and asked whether he was

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

1  performing air brake test on cars properly and complying with the Federal Hours-of-Service law

2  49 U.S.C. Secs. 21101-21109.  Krich raised his voice, claiming that the railroad made him go

3  over his hours of service and said that it was none of Rookaird's business.  Gordon and Fortt then

4  entered the break room and Gordon told Rookaird to leave three times in rapid succession, yelling

5  "Leave, Leave, Leave" while standing inches from Rookaird "like a drill sergeant." Rookaird left

6  the property at approximately 8:20 p.m.; approximately two hours before his shift was scheduled

7  to end and six hours before he would have been required to stop working.  Later that evening on

8  February 23, 2010, Stu Gordon emailed his bosses (Johnson, Jones, and Beck) in which Gordon

9  admits that Rookaird and his crew returned to Swift he stated, "You chose to make an air test on

10  cars that you were just going to set over to another track that wasn't necessary."  Gordon's email

11  states "Then I told him to tie up at 1950 and I watch him complete it at 2000 hours and *the tie up*

12  *sheet was printed at 2002 hours*."  (emphasis added)

13      On February 26, 2010, the railroad issued Rookaird an Formal Investigation notice

14  charging Rookaird with the following alleged rule violations: 1, failing to work efficiently during

15  his shift; 2, dishonestly reporting his off-duty time; 3,  failing to provide a signed tie-up slip; and

16  4, violating instructions to leave.  The notice also advised Rookaird he was withheld from service

17  and not allowed to work pending the investigation. The railroad held the investigation on March

18  10. In the Formal Investigation, BNSF controlled all aspects of the proceeding, from appointing

19  the presiding company officer, controlling witnesses, exhibits and testimony, to the final

20  determination of discipline. Following the investigation, the railroad claimed that Rookaird

21  violated various railroad rules—specifically General Code of Operating Rules (GCOR) Nos. 1.13,

Plaintiff's Trial Brief
No. 2:14-CV-176-RAJ
Page 4

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

1.29, 1.6, 1.9, and BNSF Northwest Division General Notice No.6—and the railroad terminated Rookaird's employment on March 19. The other two members of Rookaird's crew were also subjected to Formal Investigations.  However, they received 30-day record suspensions with either a one- or three-year probationary period. A record suspension is on paper only, the workers lost no actual time. Neither of the crew members was terminated.

## **PROCEDURAL POSTURE**

On June 23, 2010, Plaintiff filed a complaint with the Occupational Safety and Health Administration (OSHA) of the Department of Labor that the railroad's termination of his employment violated the whistleblower protections of the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20109. On January 18, 2013, after completing its investigation, OSHA issued its findings that the railroad had violated section 20109, awarded damages, and ordered that Plaintiff be immediately reinstated. OSHA found that BNSF's conduct was so egregious that it also ordered the railroad to pay $25,000.00 in punitive damages.

Both parties filed objections to the order and appealed OSHA's decision to the Office of Administrative Law Judges. On December 19, 2013, Plaintiff exercised his right to remove the action to Federal Court pursuant to 49 U.S.C. § 20109(d)(3) and on February 4, 2014, Plaintiff filed his Complaint in this Court.[1]

---

[1] ECF No. 1.

Plaintiff's Trial Brief
No. 2:14-CV-176-RAJ
Page 5

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

1    This matter was tried to a jury in May 2016, which found that the railroad unlawfully

2    retaliated against Plaintiff and awarded damages in the amount of $1.2 million, which was the

3    final judgment entered by the Court. Included in the award were punitive damages of

4    $200,000.00.  [Dkt. No. 223.] The trial court also awarded attorneys' fees, costs, and expenses.

5    [Dkt. No. 306.]  BNSF did not appeal the court's determination of attorneys' fees, costs, and

6    expenses to the Ninth Circuit.  The Ninth Circuit Court of appeals affirmed most of the District

7    Court's rulings in holding that "Rookaird was entitled to summary judgment on the

8    contributing-factor element of his prima facie showing, but that he was not entitled to summary

9    judgment on his substantive case." *Rookaird*, 908 F.3d at 462. The Court affirmed that "the

10   district court did not err in denying BNSF's motion for judgment as a matter of law with respect

11   to whether Rookaird engaged in FRSA-protected activity" and that "there was no genuine dispute

12   of material fact that the circumstances were sufficient to raise the inference that the air-brake test

13   was a contributing factor in Rookaird's termination" *Id*. at p. 456, 462.

14        The Ninth Circuit expressed no opinion as to whether its reversal required a new trial on

15   damages or BNSF's affirmative defense. On remand, this Court was issued an order reopening

16   causation, damages, and BNSF's affirmative defense it would have terminated Rookaird, even

17   absent protected activity. [Dkt. No. 328 at p. 4.] The Court must now determine the remaining

18   issues.

19        Tragically, in the aftermath of the original trial, Curtis Rookaird developed cancer and

20   died of the disease on September 10, 2021.  Aware that his condition was terminal, Rookaird

21   executed a Last Will and Testament on August 23, 2021, attached hereto as Exhibit A, in which

Plaintiff's Trial Brief
No. 2:14-CV-176-RAJ
Page 6

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

1    Rookaird nominated his brother-in-law, Paul Parker, to be his personal representative.  As seen

2    in Sections III and VI of the Will, Rookaird directed that Parker assume responsibility for this

3    litigation.  The Will was duly filed with the Superior Court for Snohomish County and the Court

4    appointed Parker as Personal Representative. [Dkt. 408-6.]  Parker was then properly substituted

5    as Plaintiff in this case in place of Curtis Rookaird.

## BACKGROUND & HISTORY OF RELEVANT LAW

7            Congress first enacted the FRSA in 1970 "to promote safety in every area of railroad

8    operations and reduce railroad-related accidents and incidents." Federal Railroad Safety Act

9    (FRSA) of 1970, Pub. L. No. 91-458, § 101, 84 Stat. 971 (codified as amended at 49 U.S.C. §

10   20101 (2012)). Ten years later, Congress added a substantive anti-retaliation cause of action,

11   protecting railroad workers from the discrimination they faced working for the rail carriers.

12   Federal Railroad Safety Act (FRSA) of 1980, Pub. L. No. 96-423, § 10, 94 Stat. 1815 (codified

13   as amended at 49 U.S.C. § 20109(a) (2012)). Only seven cases were filed under the 1980

14   anti-retaliation measures between their enactment and 2007, and only once was a railroad

15   employee successful in recovery. *See Cusack v. Trans-Global Solutions, Inc*., 222 F.Supp.2d 834,

16   842 (S.D. Tex. 2002).

17          Because of these hearings, Congress enacted wide-sweeping amendments to strengthen the

18   FRSA in 2007, including: (1) ending Section 3 tribunal jurisdiction over FRSA complaints,

19   authorizing the Department of Labor to investigate the complaints, Administrative Law Judge

20   adjudications, and Administrative Review Board precedential decisions interpreting the statute;

21   (2) providing relief in federal courts; (3) relaxing standards of proof and causation; and (4)

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

1    specifying that the FRSA does not preempt or diminish any other rights that an employee may

2    have. *Implementing Recommendations of the 9/11 Commission Act of 2007*, Pub. L. No. 110-53,

3    § 1521, 121 Stat. 444 (codified as amended at 49 U.S.C. § 20109).

4         The FRSA's whistleblower protections, in their current form, provide that a railroad carrier

5    "may not discharge, demote, suspend, reprimand, or *in any other way* discriminate against an

6    employee if such discrimination is due, *in whole or in part* to the employee's engagement in one

7    or more expressly enumerated protected activities. 49 U.S.C. § 20109(a) (emphasis added).

8                                      **FRSA BURDEN SHIFTING**

9         Congress designed the FRSA to provide railroad employees broader protections than those

10   provided by similar statutory frameworks. Most employment-discrimination cases employ the

11   burden-shifting structure articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)

12   and its progeny. But the FRSA mirrors other transportation employee protection provisions by

13   incorporating whistleblower procedures enacted by the Wendell H. Ford Aviation Investment and

14   Reform Act for the 21st Century ("AIR-21"), which governs whistleblower claims in the aviation

15   industry. *See* 49 U.S.C. § 42121(b) (2012) (describing AIR-21 procedures); *see also* 49 U.S.C. §

16   20109(d)(2)(A) (2012) (providing that FRSA whistleblower actions "shall be governed under the

17   rules and procedures set forth in section 42121(b)"). AIR 21 rules are more liberal than those

18   under McDonnell-Douglas.

19        To prevail on an FRSA claim, railroad employees need only establish by a preponderance

20   of the evidence they: (1) engaged in a protected activity as defined by the statute; (2) that the

21   railroad knew or suspected that the employee engaged in the protected activity; (3) that the

Plaintiff's Trial Brief
No. 2:14-CV-176-RAJ
Page 8

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

employee suffered an unfavorable personnel action; and (4) that the protected activity was a contributing factor in the unfavorable personnel action. *See* 49 U.S.C. § 42121(b)(2)(B)(iii) (defining criteria for Secretary of Labor to find violation of AIR-21); *Araujo v. N.J. Transit Rail Ops., Inc.*, 708 F.3d 152, 157 (3rd Cir. 2013) (identifying essential elements of FRSA whistleblower claim); *Rudolph v. Nat'l R.R. Passenger Corp.*, ARB No. 11-037, ALJ No. 2009-FRS-15, slip op. at 11 (ARB March 29, 2013).

Courts have found that the "contributing factor" standard applied in FRSA cases is a much easier burden to establish than the "motivating" or "substantial" factor standard applied in other discrimination cases. A "contributing factor" is "*any* factor which, *alone or in connection with other factors,* tends to affect in *any way* the outcome of the decision." *Araujo*, 708 F.3d at 158 (quoting *Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993)) (emphasis added); *see also Allen v. Admin. Review Bd.*, 514 F.3d 468, 476 n.3 (5th Cir. 2008) (regarding a Sarbanes-Oxley whistleblower complaint).

The FRSA whistleblower protections differ from other whistleblower statutes in that the FRSA adopts a burden-shifting framework "*distinct from the McDonnell Douglas* burden-shifting framework applicable to Title VII claims." *Allen*, 514 F.3d at 476 (emphasis added). This framework proceeds in two phases:

> Once the plaintiff asserts a prima facie case, the burden shifts to the employer to demonstrate by *clear and convincing evidence*, that the employer *would* have taken the *same* unfavorable personnel action in the absence of that behavior.

Plaintiff's Trial Brief
No. 2:14-CV-176-RAJ
Page 9

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

1   *Araujo*, 708 F.3d at 159 (emphasis added) (quotation omitted). The burden imposed on the

2   plaintiff under AIR-21 and the FRSA is "much easier for a plaintiff to satisfy" and is "much more

3   protective of plaintiff-employees" than many employment statutes.  *Id.* at 158-59.

4          The two steps of the FRSA's burden-shifting framework must not be merged: a railroad's

5   assertion of non-retaliatory reason for its adverse action "may *not* be weighed against an

6   employee's showing of contributing factor." *Powers*, 2015 WL 1607343 at *12 ("fully

7   adopt[ing]" the ARB's holding from *Frodham v. Fannie Mae*). The first step of the process must

8   not be contaminated by the second step. Rookaird's proof that his engaging in protected activity

9   played any part in bringing about his termination cannot be offset or undercut by the railroad's

10  suggestion it would have terminated him anyway; the veracity of the railroad's argument simply

11  does not pertain to whether Rookaird has satisfied the contributing-factor element.

12                              **STATEMENT OF ISSUES**

13  (1)   Was Rookaird's protected activity of conducting air-brake tests on railcars
14        hauling explosive hazmat materials a but-for cause in terminating his
15        employment? *See Bostock v. Clayton County*, 140 S.Ct. 1731 (June 15,
16        2020) (slip opinion).
17
18  (2)   If  Rookaird satisfies but-for test by a preponderance of the evidence, can
19        BNSF demonstrate by clear and convincing evidence that it would have
20        terminated Rookaird had he not conducted the air-brake test? *Rookaird*, 908
21        F.3d at 460.
22
23  (3)   If BNSF fails to show by clear and convincing evidence that it would have
24        terminated Rookaird, had he not conducted the air-brake test, what are
25        appropriate damages? [Dkt. No. 328 at p. 4.]

26

Plaintiff's Trial Brief
No. 2:14-CV-176-RAJ
Page 10

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

# ANALYSIS

## I.     Issues conclusively established by the first trial.

Much of the first trial was affirmed by the Ninth Circuit. BNSF should not be permitted to relitigate matters affirmed on appeal and not reopened by the Court on remand. Specifically, the Ninth Circuit concluded that Rookaird's decision to conduct air-brake testing was protected activity under the FRSA. Indeed, the Ninth Circuit affirmed entry of summary judgment on the entirety of Rookaird's *prima facie* case, including that the circumstances surrounding Rookaird's termination supported an inference that BNSF's decision to terminate Rookaird was motivated by his protected activity in violation of the FRSA. Accordingly, the only issues that remain are the but-for contributing factor element of Rookaird's substantive case, BNSF's affirmative defense, and the nature and extent of Rookaird's damages under the FRSA. Notably, the Ninth Circuit did not address the award of punitive damages. The jury did get to hear full evidence of BNSF's conduct and was properly instructed by Judge Lasnik on punitive damages. The jury, having been told that the maximum award for such damages was $250,000.000, determined that BNSF's conduct warranted an award of $200,000.00 in punitive damages. These is no reason to retry this issue.

Each the items set forth above will be addressed separately below.

## II.    Rookaird's substantive case to the jury satisfies the recently articulated but-for cause that applies to federal employment acts.

The United States Supreme Court recently clarified the legal inquiry for federal discrimination and retaliation statutes in *Bostock v. Clayton County*, 140 S.Ct. 1731 (2020).  There,

1  the Court was interpreting Title VII's language making it "unlawful. . . for an employer to fail or

2  refuse to hire or to discharge any individual, *or otherwise to discriminate against any individual*

3  with respect to his employment, *because of* such individual's [statutorily protected characteristic,

4  .such as sex.]" *Bostock*, 140 S.Ct. at 1739 (citing 42 USC §2000e—2(a)(1)). Relying on the

5  *because of* language in Title VII, the Court deemed the appropriate test to be one of "but-for"

6  causation.   The Court's analysis explained the standard that courts are to apply in analyzing

7  discrimination statutes:

8       In other words, a but-for test directs us to change one thing at a time and see if the
9       outcome changes. If it does, we have found a but-for cause…[T]he adoption of the
10      traditional but-for causation standard means a defendant cannot avoid liability just
11      by citing some *other* factor that contributed to its challenged employment decision.
12      So long as the plaintiff's [statutorily protected status] was one but-for cause of that
13      decision, that is enough to trigger the law.

14  *Id.* at 1740.

15       *Bostock's* guidance is instructive to how courts should analyze and interpret the FRSA.

16  The operative language protecting railroaders is that a railroad:

17      [Ma]y not discharge, demote, suspend, reprimand, *in any other way discriminate*
18      *against an employee* if such discrimination *is due, in whole or in part,* to the
19      employee's lawful, good faith act done, or perceived by the employer to have been
20      done or about to be done [in furtherance of protected activity.]

21  49 USC § 20109(a)(1)-(7). Where Title VII prohibits discrimination "because of" a protected

22  characteristic, the FRSA prohibits discrimination "due, in whole or in part, to" a protected class

23  of workers. Under *Bostock*, the causation standard necessary on Rookaird's substantive case is

24  one of "but-for" causation. *See also*, *Wooten v. BNSF Ry. Co.*, 2020 WL 3410888 at *1 (affirming

25  contributing factor instruction that provided a contributing factor "is any factor which, alone or

Plaintiff's Trial Brief
No. 2:14-CV-176-RAJ
Page 12

1    in connection with other factors, affected the outcome of BNSF's personnel decision…" (citing

2    *Frost v. BNSF Ry. Co*., 914 F.3d 1189, 1195 (9th Cir. 2019)).

3        *Bostock* holds that under a "traditional but-for causation standard…a defendant cannot

4    avoid liability just by citing some *other* factor that contributed to its challenged employment

5    action."); See also *Frost*, 914 F.3d at p. 1197 (holding that a plaintiff is "not required to show that

6    his [protected activity] was the *only* reason or that no other factors influenced BNSF's decision

7    to terminate him.") and *DeFrancesco*, 2012 WL 694502 at *3 (stating that "a change in the

8    employer's attitude toward the complainant after he or she engages in protected activity" is

9    circumstantial evidence that the protected activity was a contributing factor of the adverse action);

10   *see also Araujo*, 708 F.3d at 160 (noting that temporal proximity between the engagement in

11   protected activity and the unfavorable personnel action can be circumstantial evidence to satisfy

12   the contributing-factor element).

13
14   ###     III.    BNSF cannot demonstrate its affirmative defense, by clear and convincing evidence, that it would have terminated Rookaird absent the air-brake test.

15       The railroad bears the burden of persuasion on its statutory defense that clear and

16   convincing evidence establishes that it would have terminated Rookaird even absent Rookaird's

17   protected activity. *See* 49 U.S.C. §§ 42121(b)(2)(B)(ii) (discussing employer's burden);

18   20109(d)(2)(A)(i) (referencing *AIR-21* as establishing burden of proof in FRSA actions). BNSF's

19   argument is likely to be that Rookaird's other alleged violations of company policy, namely failure

20   to leave the property when instructed and submission of an inaccurate timecard, justified the

21   termination. Such a showing cannot escape liability under the FRSA.

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

1    BNSF will argue that this may be sufficient showing under a *McDonnell Douglas* burden-

2    shifting statute. *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (discussing an

3    employer's burden under the analysis articulated by the Supreme Court in *McDonnell Douglas*

4    *Corp. v. Green*). But unfortunately for the railroad, case law conclusively establishes that showing

5    a legitimate, non-discriminatory reason for its actions cannot carry its burden under the FRSA.

6    *Bostock*, 140 S.Ct. 1731; *Frost*, 914 F.3d at p. 1197; *Araujo*, 708 F.3d at 162 (noting that

7    application of *McDonnell Douglas* burden-shifting framework to an FRSA claim may lead to a

8    result more favorable to the railroad). The railroad cannot avoid liability simply by showing it

9    had a legitimate business reason for terminating Rookaird's employment. *See Barker v. Ameristar*

10   *Airways, Inc.*, No. 05-058, 2007 WL 4623496, at *6 (ARB Dec. 31, 2007) (concluding that *AIR-*

11   *21's* burden-shifting framework requires more than clear and convincing evidence that the

12   employer had legitimate business reasons for its actions and rejecting the ALJ's reliance on

13   *McDonnell Douglas*).

14   BNSF's arguments to include a business judgment instruction or to justify its retaliatory

15   actions towards employees have been rejected by the Ninth Circuit on at least two occasions. In

16   *Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1196 (9th Cir. 2019), the Ninth Circuit reversed the trial

17   court's decision to include a business judgment instruction. the Ninth Circuit clarified a railroad's

18   burden to prove their affirmative defense. An employee is "not required to show that his injury

19   report was the *only* reason or that no other factors influenced BNSF's decision to terminate him."

20   *Id*. at 1197. The Ninth Circuit relied upon the "AIR-21 standard" in concluding that an employee

21   still may have relief even where their protected activity "played only a very small role in BNSF's

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN 55127
651-288-9500

decision-making process." *Id*.  See also, *Wooten v. BNSF,* 9:2016-cv-00139 (D. Mont. 2018); No. 19-35431, (9th Cir. 2020).  We anticipate that BNSF will again in this case attempt to convince this court to follow decisions from other circuits that have been rejected by the Ninth Circuit and/or US District Courts in the Ninth Circuit, including, *Rookaird*, *Frost*, and *Wooten*.

BNSF left no question that the air-brake test played a role in its decision to terminate Rookaird. In an email to railroad management, Robert Johnson, the General Director of Transportation for BNSF's Northwest Division, and the conducting officer of BNSF's investigation of Rookaird stated:

> I am not going to tell you this crew was the only crew that played the slow down game! However, I will tell you that this crew made a fatal mistake *and we have to make an example out of them*. To put this in perspective, the behavior displayed in this move severely impacted BNSF in our customer's eyes and we have to ensure it doesn't happen again.

Johnson's email alone undercuts any claim that BNSF would have taken the same action against Rookaird absent protected activity. Instead, senior management at BNSF admits that it penalized Rookaird for conducting the air-brake test to make an example out of him. Because of such evidence, the railroad cannot succeed with its affirmative defense it would have terminated Rookaird absent protected activity.

## IV.   As found by the first jury, Rookaird is entitled to compensatory damages, punitive damages, and reasonable costs and attorney fees.

The FRSA provides that a successful FRSA plaintiff is "entitled to all relief necessary to make the employee whole." 49 U.S.C. § 20109(e)(1) (emphasis added).  Besides this broad sweeping, general language, the statute also lists certain specific types of damages, including

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

1    reinstatement, back pay with interest, and compensatory damages. 49 U.S.C. § 20109(e)(2)(A)-

2    (C). The statute therefore provides for recovery to compensatory damages, including lost wages,

3    mental anguish, loss of enjoyment of life, and litigation costs, and punitive damages intended to

4    deter the railroad from engaging in this conduct.

5                    **a.    Compensatory Damages**

6         Rookaird is entitled to compensatory damages in wages lost from BNSF's illegal

7    termination of his employment. Despite being ordered to do so by OSHA nearly ten years ago, the

8    railroad has continuously refused to reinstate Rookaird to employment. Rookaird will ask the jury

9    to award him full back pay from the day BNSF terminated his employment to present. And the

10   railroad must compensate Rookaird for the benefits he has lost because of the wrongful

11   termination, including retirement and pension benefits with the Railroad Retirement Board.

12        The FRSA also requires Rookaird to be "made whole" from the mental anguish and related

13   loss of enjoyment of life and non-economic damages he has suffered because of the railroad's

14   actions. A proud father, the railroad has forced Rookaird to endure the anguish and frustration that

15   goes hand in hand with being wrongfully terminated from his job and subjected him to the stress

16   that results from having to make do without his railroad salary. He was forced to take a job in

17   North Dakota for a time, incurring relocation costs and being forced to be apart from his family

18   for extended periods. Because of the railroad's termination, Rookaird lost his family home to

19   foreclosure. 27 Additionally, Rookaird should be awarded sufficient money to offset the tax

20   liability for any award he may receive. *See Blaney v. Int'l Ass'n of Machinists*, 55 P.3d 1208

21   (Wash. App. 2002) (holding that courts must include in damage awards additional monies to

Plaintiff's Trial Brief
No. 2:14-CV-176-RAJ
Page 16

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

insulate successful plaintiffs from adverse tax consequences resulting from damage recovery),

aff'd 87 P.3d 757 (Wash. 2004).

### b.    Front-Pay

The FRSA provides that "relief in an action under [the statute] shall include reinstatement

with the same seniority status that the employee would have had, but for the discrimination." 49

U.S.C. § 20109(e)(2)(A). Sometimes, however, reinstatement is either not practical or advisable

due to the animosity between the parties because of the circumstances surrounding an employee's

termination and the protracted litigation that may often follow. *See Cassino v. Reichhold

Chemicals, Inc.*, 817 F.2d 1338, 1347 (9th Cir. 1987), *cert. denied*, 484 U.S. 1047, 108 S. Ct. 785

(1988).

In such cases, the district court may direct that front pay be awarded in lieu of

reinstatement. In *Cassino*, the Ninth Circuit interpreted the Age Discrimination in Employment

Act, which allowed the district court to "grant such legal or equitable relief as may be

appropriate… including without limitation judgments compelling employment, reinstatement or

promotion." 817 F.2d at 1346 (citing 29 U.S.C. § 626(b)) (omission in original). While *Cassino*

does stand for the proposition that "the decision whether to order the equitable remedy of

reinstatement or, in the alternative, to award front pay, is a decision for the trial court," it says that

"[i]f the court concludes that reinstatement is not feasible, the jury then decides the amount of the

front pay award." Id. at 1347 (emphasis added); *see also Maxfield v. Sinclair Intern.*, 766 F.2d

788, 796 (3rd Cir. 1985) ("Of course the amount of damages available as front pay is a jury

question."), *cert. denied*, 474 U.S. 1057, 106 S. Ct. 796 (1986); *Hansard v. Pepsi-Cola Metro.*

Plaintiff's Trial Brief
No. 2:14-CV-176-RAJ
Page 17

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

*Bottling Co.*, 865 F.2d 1461, 1470 (5th Cir. 1989) (holding that the jury should determine the amount of front pay); *Fite v. First Tennessee Production Credit Ass'n,* 861 F.2d 884, 896 (6th Cir. 1989) (same); *Coston v. Plitt Theatres, Inc.*, 831 F.2d 1321, 1333 n.4 (7th Cir. 1987) ("Authority and reason both suggest that while the decision to award front pay is within the discretion of the trial court, the amount of damages available is a jury question."), vacated on other grounds, 486 U.S. 1020, 108 S. Ct. 1990 (1988).

The Ninth Circuit later backed away from—but did not overrule—*Cassino*, commenting that the line was "plainly dicta." *Traxler v. Multnomah Cnty.*, 596 F.3d 1007, 1013 (9th Cir. 2010). But the statutory language authorizing reinstatement as a remedy in Title VII and the FMLA are intentionally more narrow in scope than the FRSA because of the FRSA's broad remedial purposes.

In *Traxler*, the Ninth Circuit held that front pay under the Family Medical Leave Act is "an equitable remedy that must be determined by the court, both as to the availability of the remedy and the amount of any award." 596 F.3d at 1011. In reaching this decision, the court cited *Pollard v. E.I. di Pont de Nemours & Co*., in which the United States Supreme Court distinguished front pay from compensatory damages under Title VII, noting that front pay was the "monetary equivalent of the equitable remedy of reinstatement." 532 U.S. 843, 853 n.3 (2001). Like Title VII, the FMLA employs two mutually exclusive categories of remedies: "damages" and "equitable relief," with reinstatement undeniably falling under the later. 29 U.S.C. § 2617. Following *Pollard*, the Ninth Circuit held that front pay, as the monetary equivalent of reinstatement, was equitable under the FMLA. *Traxler*, 596 F.3d at 1011-12.

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

But unlike the FMLA or Title VII, the FRSA provides for reinstatement as a damage *at law*, not at equity. *See* 49 U.S.C. 20109(e)(2)(A) (providing that a successful plaintiff is entitled to "all relief necessary to make the employee whole" including reinstatement). While the holding of *Pollard* and its progeny—that front pay is an equitable remedy and both availability and amount are to be determined by the district court—is therefore inapplicable in cases interpreting the FRSA, the logic and rationale behind the caselaw relates to the analysis. In *Pollard*, the Supreme Court distinguished front pay from the general category of compensatory damages noted that "front pay… is the monetary equivalent of the equitable remedy of reinstatement." 532 U.S. at 853 n.3 (emphasis added). Because reinstatement under Title VII is an equitable remedy, and front pay is the "monetary equivalent" of reinstatement, front pay under Title VII must be equitable.

By extension, because reinstatement is a legal remedy under the FRSA, and front pay is its monetary equivalent, the amount of front pay as legal damages should be determined by the jury, subject only to the district court's power of remittitur. *Cf. Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1189 (2nd Cir. 1992) (affirming jury award of $667,000 in front pay as not shocking to the conscience where "all money damage awards under [the statute] are legal remedies"); *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991) ("The question of who should determine the amount of front pay to be awarded—the jury or the trial judge—rests on whether front pay is a legal or equitable remedy.").

### c.   Punitive Damages do survive the death of an FRSA claimant.

Questions about the survivability of punitive damages can be troublesome. BNSF maintains that punitive damages are disallowed because Rookaird has died, and such damages do

Plaintiff's Trial Brief
No. 2:14-CV-176-RAJ
Page 19

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

not survive his death.  However, a closer look at the case law and the policy considerations shows that punitive damages should survive.

This is a matter of first impression in the 9th Circuit and perhaps the country in the FRSA context.

Courts often address the survivability of punitive damages through the lens of penal versus remedial statutes, arguing that penal claims do not survive a Plaintiff's death while remedial measures do. Wheeler v. City of Santa Clara, 894 F.3d 1046 (9th Cir. 2018).

In the present case, however, there are several undisputed factors that militate toward a finding that punitive damages do survive.

First, Rookaird already has been awarded punitive damages with his claim: initially by OSHA and then again by the jury in the 2016 trial. That jury had an opportunity to evaluate the credibility of numerous BNSF witnesses in recounting the conduct surrounding Rookaird's termination. The jury was thoroughly and properly instructed on the law by Judge Lasnik in concluding that punitive damages were warranted.

Second, Rookaird, knowing he was terminally ill, executed a Will on August 23, 2021 (Exhibit A attached hereto). The Will was properly attested to by two neighbors who affirmed that Rookaird "was of sound and disposing mind and memory" and that he was "not acting under any duress, menace, fraud, misrepresentation, or undue influence." (See page 7 of the will.) Sections III and V of the will specifically bequeath any recovery from this case, including punitive damages, to his widow, and directs the personal representative, Mr. Paul Parker, who is now the Plaintiff, to prosecute the claim.

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

1   Third, the State of Washington has an interest in protecting the Federal rights of its

2   citizens. This was manifested by the fact that Rookaird's will had to be processed through the

3   Snohomish County District Court for Parker to be formally named Personal Representative and

4   to be given the authority to comply with Rookaird's directives.

5   Punitive damages, BNSF argues, must be stricken because they are penal and not remedial.

6   However, that is inaccurate. The United States Supreme Court in Carlson v. Green 446 U.S. 14

7   (1980), a Bivens action, stated that "Punitive damages are a particular *remedial* mechanism

8   normally available in the federal courts[.]" 446 U.S. at 21-22. Emphasis added. The reasoning is

9   appropriate to this FRSA claim. Clearly, based on the previously cited legislative history of the

10  FRSA, the law is remedial. It remedied the problem of intimidation of railroad workers by

11  management.

12  Finally, the common law stating that penal provisions do not survive but remedial

13  provisions to, is very old dating at least to Ex parte Schreiber 3 S.Ct. 423 (1884). Schreiber and

14  not in keeping with modern sensibilities about damages. Followed to its logical conclusion, the

15  notion that punitive damages should not survive would make it better for a wrongdoer to kill

16  rather that injure. Modern survival statutes support a rule that claims a person (decedent) has or

17  had a right to pursue punitive damages prior to death or to a duly appointed personal

18  representative,

19

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

### d. Mitigation of Damages has been decided and should not be an issue in the retrial.

Judge Lasnik specifically refused to submit a Mitigation of Damages Instruction to jury because he found that the railroad had not met its burden on this issue. The full discussion is found at pages 1084 through 1095 of the transcript. Those pages are attached as Exhibit B. Nothing has changed in the years since the trial to change that determination. The Court should consider no arguments submitted by BNSF to the effect that Rookaird failed to mitigate.

If this court allows mitigation of damages, BNSF has the burden of proof on all essential elements of the affirmative defense. Evidence submitted by Rookaird to OSHA and by our firm to BNSF defense counsel proves that Rookaird made substantial efforts at applying for jobs. This evidence will be produced as Plaintiff Trial Exhibit 318.

### LITIGATION COSTS AND ATTORNEY FEES

The FRSA provides that a successful FRSA plaintiff is entitled to "litigation costs, expert witness fees, and reasonable attorney fees." 49 U.S.C. § 20109(e)(2)(C). If the Court finds in Rookaird's favor, the appropriate motions for these items will be submitted under Fed. R. Civ. P. 54, LCR 54(d), and the orders of this Court.

### CONCLUSION

Rookaird engaged in protected activity under the FRSA by performing air-brake testing and taking the safe course consistent with his training. Evidence will demonstrate, by a preponderance of the evidence, this protected activity was a contributing factor in BNSF's decision to terminate Rookaird's employment. The railroad will then *fail* to meet its heavy burden, by clear

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

and convincing evidence, that it *would* have taken the same course absent the air-brake testing.

Rookaird will ask the Court to find that the railroad violated the FRSA and awarding damages

would have made him whole, including lost wages in the form front-pay and back-pay, lost fringe

benefits in the form of his pension and retirement, compensatory damages, punitive damages, and

reasonable litigation expenses including attorney fees and costs for expert witnesses.

Respectfully submitted,

Dated: October 18, 2021           YAEGER & JUNGBAUER BARRISTERS, PLC

By: */s/ William G. Jungbauer*
William G. Jungbauer, admitted *pro hac vice*
4601 Weston Woods Way
Saint Paul, MN 55127
Telephone: (651) 288-9500
wjungbauer@yjblaw.com

-and-

Bradley K. Crosta, WSBA #10571
CROSTA LAW OFFICE. PLLC
19743 1st Avenue South
Normandy Park, WA, 98148
Telephone: (206) 623-9400
bcrosta@crostalaw.com

*Attorneys for Plaintiff Paul W. Parker,*
*as Personal Representative for the*
*Estate of Curtis John Rookaird*

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500

## CERTIFICATE OF SERVICE

I certify under penalty of perjury under the laws of the State of Washington, the State of Minnesota, and the United States of America that on October 18, 2021, electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system that will send notification of such filing to the following counsel:

Timothy D. Wackerbarth
LANE POWELL
1420 Fifth Avenue, Suite 4200
P.O. Box 91302
Seattle, WA 98111-9402
E-Mail: wackerbartht@lanepowell.com

Keith Goman, admitted pro hac vice
Hall & Evans LLC
1001 17th Street; Suite 300
Denver, CO 80202
Email: gomank@hallevans.com

Bradley K. Crosta
Crosta Law Office, PLLC
19743 1st Avenue South
Normandy Park, WA, 98148
E-Mail: bcrosta@crostalaw.com
Local Counsel for Plaintiff

DATED this 18th October 2021 at St. Paul, Minnesota.

/s/ Roxanne Russell
Roxanne Russell

Plaintiff's Trial Brief
No. 2:14-CV-176-RSL
Certificate of Service

Yaeger & Jungbauer Barristers, PLC
4601 Weston Woods Way
St. Paul, MN  55127
651-288-9500