HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

Paul W. Parker, Personal Representative of the Estate of Curtis John Rookaird,

    Plaintiff,

    v.

BNSF Railway Company,

    Defendant.

Case No. 2:14-cv-00176-RAJ

FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I. INTRODUCTION

On February 4, 2014, then-Plaintiff Curtis Rookaird sued Defendant BNSF Railway Company ("BNSF") under 49 U.S.C. § 20109(d)(3), alleging that the railway violated the anti-retaliation provision of the Federal Railroad Safety Act ("FRSA"). Dkt. # 1. Two years later, in 2016, the Court tried this case to a verdict. Dkt. ## 202, 204-06, 209, 212, 215, 219. After the first trial, the jury found in Mr. Rookaird's favor. Dkt. ## 219, 221. Later, however, the Ninth Circuit vacated the jury verdict and remanded to this Court to retry certain issues. Dkt. # 310. On remand, the parties stipulated to a bench trial, and the Court heard this matter on October 25, 2021 through October 28, 2021. Dkt. ## 454-58. The parties later submitted proposed findings of fact and conclusions of law. Dkt. ## 471, 472.

ORDER – 1

The procedural posture of this case affected both the issues and evidence presented at trial. On remand, the issues to be retried were limited to whether Plaintiff could prove, by preponderance of the evidence, that Mr. Rookaird's refusal to stop performing the air test was a contributing factor in his termination; whether BNSF could prove, by clear and convincing evidence, that it would have fired Mr. Rookaird absent the air test; and damages. Dkt. # 365 at 1-5. As to the evidence presented, the bench trial included the live testimony of several lay and expert witnesses and the admission of various exhibits into evidence. But given that the facts underlying this case occurred long ago and that many witnesses had already testified at the first trial, both parties also submitted deposition and trial designations for the Court's consideration. Dkt. ## 468-69.

Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following findings of fact and conclusions of law, which are based upon consideration of all the admissible evidence and this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent, if any, that Conclusions of Law, as stated may be considered Findings of Fact, they shall be deemed Findings of Fact.

## II. FINDINGS OF FACT

**A. February 23, 2010**

1. On February 23, 2010, Mr. Rookaird reported for work at BNSF's Swift depot location in Blaine, Washington. Dkt. # 441 at 16.
2. He began his shift at 2:30 P.M. *Id.*
3. Mr. Rookaird, a conductor, was accompanied by engineer Peter Belanger and brakeman Matthew Webb. *Id.* at 18, 149.
4. That day, the three-person crew was given several tasks. Primarily, the crewmembers were supposed to go from Swift to Cherry Point, where they would service customers. Dkt. # 440 at 87-88, 103; Dkt. # 441 at 26-27.

ORDER – 2

   Before going to Cherry Point, however, the crewmembers were instructed first to take a van, from Swift, south to Ferndale, where certain locomotives were waiting.  Dkt. # 440 at 103-104; Dkt. # 441 at 26-27.  From Ferndale, they were supposed to take the locomotives back north to Custer, which sits between Ferndale and Swift.  Dkt. # 440 at 103; Dkt. # 441 at 35.  At Custer, they were supposed to move 42 railway cars onto storage tracks.  Dkt. # 440 at 103-04; Dkt. # 441 at 19, 22, 154.  Finally, after moving the cars onto storage tracks, they were supposed to take a van to Cherry Point to service BNSF customers.  Dkt. # 440 at 134; Dkt. # 441 at 91-92.

5. As instructed, Mr. Rookaird and his crew departed Swift for Ferndale.  Dkt. # 440 at 105-06; Dkt. # 441 at 29-30.

6. Once they arrived at Ferndale, they took two locomotives north to Custer so that they could move the 42 cars onto storage tracks.  Dkt. # 441 at 35, 153.

7. While they were moving the cars at Custer, the crewmembers decided to perform an air test.  *Id.* at 63, 76-77.

8. The air test took about 20 to 40 minutes to perform.  *Id.* at 77, 160.

9. At BNSF, air tests are routine given that they are conducted hundreds of times a day or more.  Dkt. # 466 at 33.

10. Indeed, Mr. Rookaird conducted air tests several times weeks before without reprisal.  *Id.* at 33-34.

11. During the air test, BNSF trainmaster Dan Fortt called the crewmembers on the radio and asked them why they were conducting the test.  Dkt. # 441 at 78.  He said, "I'm not from around here, and I don't know how you guys do anything.  But from where I'm from, we don't have to air test the cars."  *Id.* at 79.

12. Despite his remarks, Mr. Fortt did not instruct the crew to stop the air test.  *Id.* at 80, 160.

ORDER – 3

13. The crew later completed the test. *Id.*
14. Later, while the crew was moving the 42 cars, Mr. Fortt contacted the crew again. *Id.* at 85. This time, Mr. Fortt asked how much longer the crew was going to take to complete the moving of the cars into storage, and Mr. Rookaird estimated that it would take another hour or two. *Id.* at 85-86.
15. After discovering how much longer it would take, Mr. Fortt instructed the crew to tie the cars down to the main line because another crew was going to complete the job. *Id.* at 89; Dkt. # 423-2 at 31-32. He then instructed Mr. Rookaird's crew to report back to the Swift depot. Dkt. # 466 at 58-59; Dkt. # 423-2 at 26.
16. By that time, which was about 7:30 P.M., or about five hours since Mr. Rookaird and his crew started their shift, Mr. Fortt and BNSF assistant superintendent Stuart Gordon believed that the crew was inefficient and that the crew should have been farther along in their work assignment. Dkt. # 466 at 49, 58-59, 102-03; Dkt. # 441 at 161; Dkt. # 423-2 at 32.
17. The crewmembers then returned to the Swift depot. Dkt. # 441 at 161.
18. When they arrived, Mr. Gordon told them to tie up and go home. *Id.* at 92-93, 161-62; Dkt. # 466 at 61-62.
19. "Tying up" refers to the process of completing a "tie-up" sheet to comply with Federal Railroad Administration regulations. Dkt. # 465 at 165-66.
20. Mr. Rookaird completed his tie-up slip at 8:02 P.M., yet he recorded his tie-up time as 8:30 P.M. Dkt. # 441 at 94; Ex. 521 at 2.
21. Though he completed the tie-up slip, Mr. Rookaird did not sign the slip. Dkt. # 441 at 162; Ex. 521 at 2.
22. Then, instead of going home as instructed, Mr. Rookaird went to the lunch room and argued with another employee. Dkt. # 441 at 93, 97-98, 104; Dkt. # 466 at 62-63; Ex. 532 at 108.

ORDER – 4

23. The argument escalated, prompting Mr. Gordon to intervene. Dkt. # 441 at 105; Dkt. # 466 at 62-63.
24. Mr. Gordon again instructed Mr. Rookaird to leave. Dkt. # 466 at 62-63; Ex. 532 at 106-07.
25. Mr. Rookaird did not leave and instead continued to argue. Dkt. # 466 at 63; Ex. 532 at 106-08.
26. Mr. Gordon instructed Mr. Rookaird to leave for a third time. Dkt. # 466 at 63; Ex. 532 at 106-08.
27. It was only then that Mr. Rookaird, in fact, left. Dkt. # 466 at 63; Ex. 532 at 106-08.

**B. Investigation**

28. On February 26, 2010, BNSF sent Mr. Rookaird a letter informing him that he was being investigated for his actions days earlier on February 23. Ex. 526. He was to be investigated for his failure to work efficiently, dishonesty when reporting his off-duty time, failure to provide a signed FRA tie-up timeslip, and failure to comply with instructions when instructed to leave the property. *Id.*; Ex. 529.
29. Later, BNSF officer Robert Johnson conducted an investigation. Exs. 529, 532. The investigation lasted about 12 hours and was transcribed. Ex. 532.
30. Mr. Johnson summarized the investigation and sent his summary to James Hurlburt and Doug Jones. Ex. 8. At the time, Mr. Hurlburt was the director of employee performance, and Mr. Jones was the general manager of the Northwest Division. Dkt. # 423-3 at 3; Dkt. # 465 at 66.
31. Mr. Hurlburt reviewed the investigation transcript and Mr. Johnson's summary. Dkt. # 423-3 at 6. After conducting his own independent evaluation, Mr. Hurlburt made a recommendation to Mr. Jones to dismiss Mr. Rookaird. *Id.*

ORDER – 5

32. Ultimately, Mr. Jones, who as the general manager had decision-making authority with respect to terminations, decided to fire Mr. Rookaird. *Id.*; Dkt. # 465 at 66, 70, 73-74. Mr. Jones based his decision on the investigation transcript, Mr. Johnson's summary, and discussions with Mr. Hurlburt. Dkt. # 465 at 66, 146. Based on his review, Mr. Jones concluded that Mr. Rookaird had committed significant rule violations that harmed BNSF. *Id.* at 143.

C. **Termination**

33. On March 19, 2010, BNSF fired Mr. Rookaird. Ex. 63.
34. BNSF fired Mr. Rookaird for four reasons: he failed to work efficiently, he was dishonest when reporting his off-duty time, he failed to provide a signed FRA tie-up slip, and he failed to comply with instructions when he was instructed to leave the property. *Id.* All four reasons stemmed from Mr. Rookaird's actions on February 23, 2010.
35. BNSF fired Mr. Rookaird in accordance with its Policy for Employee Performance and Accountability ("PEPA policy"). *Id.*; Dkt. # 465 at 71.
36. The PEPA policy outlined several types of rule violations and their consequences. The most severe type of violation was a dismissible violation. A single dismissible violation could result in the ultimate sanction of dismissal. A list of single aggravated offenses that were considered dismissible was contained in Appendix C of the PEPA policy. Dkt. # 465 at 75; Ex. 546.
37. Under Appendix C of the PEPA policy, a single dismissible violation included gross dishonesty and insubordination. Dkt. # 465 at 75; Ex. 324; Ex. 546 at 7.

ii. **Gross Dishonesty**

38. BNSF terminated Mr. Rookaird for his gross dishonesty. Dkt. # 465 at

ORDER – 6

170-73; Ex. 324; Dkt. # 423-3 at 6-7.

39. Mr. Rookaird recorded his tie-up time as 8:30 P.M. when he, in fact, completed his tie-up slip 28 minutes earlier at 8:02 P.M. Dkt. # 441 at 94, 152; Ex. 521 at 2.  He also did not sign his tie-up slip.  Dkt. # 441 at 162; Ex. 521 at 2.

40. BNSF believed that this was improper and dishonest.  Dkt. # 465 at 166-67; Dkt. # 423-3 at 6-8.  It believed that this dishonesty was significant because it believed that maintaining proper tie-up slips was essential to complying with federal regulations.  Dkt. # 465 at 141, 165-66; Dkt. # 423-3 at 6-8.

41. BNSF believed that Mr. Rookaird's failure to sign his FRA tie-up timeslip and his inaccurate reporting of his tie-up time constituted gross dishonesty under Appendix C of the PEPA policy.  Dkt. # 465 at 170-72; Dkt. # 423-3 at 6-8; Ex. 324.

**iii. Insubordination**

42. BNSF also terminated Mr. Rookaird for his insubordination.  Dkt. # 465 at 76-77, 165, 170; Ex. 324; Dkt. # 423-3 at 8.

43. Mr. Gordon had the authority to instruct Mr. Rookaird to tie up and go home.  Dkt. # 465 at 163-64.

44. Mr. Rookaird disobeyed Mr. Gordon's two commands to tie up and go home and instead began an argument with another employee.  Dkt. # 441 at 92-93, 97-98, 105, 161-62; Dkt. # 466 at 61-63; Ex. 532 at 106-8.

45. BNSF believed that Mr. Rookaird's refusal to comply with Mr. Gordon's instructions to tie up and go home constituted insubordination under Appendix C of the PEPA policy.  Dkt. # 465 at 76-77, 165, 170; Ex. 324; Dkt. # 423-3 at 8.

**iv. Inefficiency and Air Test**

46. Finally, BNSF terminated Mr. Rookaird for his failure to work efficiently.

ORDER – 7

Dkt. # 465 at 82, 108-09; Dkt. # 466 at 41; Ex. 324; Dkt. # 423-3 at 9.

47. On February 23, 2010, Mr. Rookaird and his crew were assigned several tasks, which included retrieving engines from Ferndale, moving 42 cars into storage at Custer, and servicing customers at Cherry Point. Dkt. # 440 at 87-88, 103-04, 134; Dkt. # 441 at 19, 22, 26-27, 91-92, 154.

48. About five and a half hours into their shift, Mr. Rookaird and his crew had still not completed the moving of the cars into storage. Dkt. # 441 at 84-86, 89.

49. BNSF believed that they were inefficient in accomplishing their tasks for that day and called them in accordingly. Dkt. # 466 at 49, 58-59, 102-03; Dkt. # 441 at 161; Dkt. # 423-2 at 32.

50. One reason for the delay was Mr. Rookaird's decision to conduct an air test, a test that BNSF believed to be unnecessary. Dkt. # 466 at 60, 121.

51. BNSF concedes that Mr. Rookaird's conducting of the air test contributed to the crew's supposed inefficiency and delay. Dkt. # 466 at 41-42, 70, 124-25.

D.   **Discipline of Matthew Webb and Peter Belanger**

52. Mr. Rookaird's crewmembers on February 23, 2010, Matthew Webb and Peter Belanger, had engaged in the same supposed inefficiency as Mr. Rookaird.

53. Like Mr. Rookaird, Mr. Webb and Mr. Belanger were disciplined for their failure to work efficiently. Exs. 3 & 5. But unlike Mr. Rookaird, Mr. Webb and Mr. Belanger were not dismissed. Instead, they each received a Level S 30 Day Record Suspension and probation. Exs. 3 & 5.

54. Unlike Mr. Rookaird, Mr. Webb and Mr. Belanger committed no other rule violations. Mr. Webb and Mr. Belanger were not disciplined for dishonesty in reporting their off-duty time, for a failure to provide a signed FRA tie-up

ORDER – 8

slip, or for a failure to comply with instructions when they were instructed to leave the property.  Dkt. # 465 at 171-72; Dkt. # 423-3 at 12-13.

### III.   CONCLUSIONS OF LAW

**A.    Procedural History**

1. On February 4, 2014, then-Plaintiff Curtis Rookaird brought this action pursuant to 49 U.S.C. § 20109, alleging that Defendant BNSF Railway Company violated the anti-retaliation provision of the Federal Railroad Safety Act ("FRSA").

2. A claim for retaliation under the FRSA has two stages: a prima facie stage and a substantive stage. *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  Each stage has its own burden-shifting framework.  *Id.*

3. At the prima facie stage, a plaintiff must make "a prima facie showing that any protected activity was a contributing factor in the unfavorable personnel action alleged in the complaint."  *Id.* at 459-60 (alteration omitted) (quoting 49 U.S.C. § 42121(b)(2)(B)(i)).  An employer, on the other hand, can defeat the plaintiff's claim "if the employer demonstrates, by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of the protected activity."  *Id.* at 460 (alteration omitted) (quoting 49 U.S.C. § 42121(b)(2)(B)(ii)).

4. On the other hand, at the substantive stage, a plaintiff must prove by a preponderance of the evidence that the protected activity was, in fact, a contributing factor in the unfavorable personnel action.  *Id.* at 460.  The employer's burden, however, remains as it was at the prima facie stage: an employer may defeat the retaliation claim if it can demonstrate by clear and convincing evidence that it would have taken the same unfavorable action absent the protected activity.  *Id.*

ORDER – 9

5. Thus, although the employer has the same burden in each stage, the plaintiff does not. *Id.*

6. After the first trial in this case, the jury concluded that Mr. Rookaird engaged in the FRSA-protected activity of refusing to stop the air test. Dkt. # 221. On appeal, the Ninth Circuit upheld that determination. *Rookaird*, 908 F.3d at 455-59.

7. The Ninth Circuit also determined that Mr. Rookaird successfully passed the prima facie stage because "the circumstances were sufficient to raise the inference that the air[] test was a contributing factor in Rookaird's termination." *Id.* at 462.

8. The Ninth Circuit vacated the verdict and reversed, however, because it found a genuine dispute of material fact as to whether Mr. Rookaird proved his substantive case. *Id.* at 462-63.

9. On remand, the Court decided to retry several issues: whether Mr. Rookaird could prove, by preponderance of the evidence, that his refusal to stop performing the air test was a contributing factor in his termination; whether BNSF could prove, by clear and convincing evidence, that it would have fired Mr. Rookaird absent the air test; and damages. Dkt. # 365 at 1-5.

10. In September 2021, after the Ninth Circuit remanded, but before this Court could retry the case, Mr. Rookaird died. Dkt. # 411.

11. The Court then substituted as a party Paul Parker, who is the personal representative of Mr. Rookaird's estate. *Id.*

**B.  Substantive Stage – Contributing Factor**

12. At the substantive stage, the plaintiff must prove by a preponderance of the evidence that his protected conduct "was a contributing factor in the unfavorable personnel action alleged in the complaint." *Frost v. BNSF Ry.*

ORDER – 10

         *Co.*, 914 F.3d 1189, 1195 (9th Cir. 2019) (quoting *Rookaird*, 908 F.3d at 460).

13. A "contributing factor" includes "any factor, which alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Rookaird*, 908 F.3d at 461 (internal quotation marks omitted) (quoting *Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 969 (8th Cir. 2017)). A contributing factor "may be quite modest," and such a factor may "play[] only a very small role" in the unfavorable personnel action. *Frost*, 914 F.3d at 1197.

14. To show a contributing factor, an employee must prove "intentional retaliation" that was "prompted by the employee engaging in protected activity." *Rookaird*, 908 F.3d at 461 (quoting *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014)). That said, the employee need not "separately prove" an employer's subjective "discriminatory intent." *Frost*, 914 F.3d at 1195. Rather, "[s]howing that an employer acted *in retaliation for* protected activity *is* the required showing of intentional discrimination." *Id.* (emphasis in original).

15. The Court concludes, by preponderance of the evidence, that Mr. Rookaird's refusal to stop the air test was a contributing factor in his termination.

16. Mr. Rookaird was fired, in part, for his inefficiency on February 23, 2010. Dkt. # 465 at 82, 108-09; Dkt. # 466 at 41; Ex. 324; Dkt. # 423-3 at 9. BNSF believed that Mr. Rookaird and his crew were taking too long to complete their assigned tasks for the day. Dkt. # 466 at 49, 58-59, 102-03; Dkt. # 441 at 161; Dkt. # 423-2 at 32.

17. BNSF concedes that the crew's inefficiency was partly caused by Mr. Rookaird's decision to conduct an air test—a test that BNSF managers

ORDER – 11

|   |     |   |
|---|-----|---|
| 1 |     | thought was unnecessary to conduct in the first place. Dkt. # 466 at 41-42, 70, 60, 121, 124-25. |
| 3 | 18. | Because Mr. Rookaird was fired for his inefficiency and because the inefficiency was partly caused by the protected activity of refusing to stop the air test, the Court concludes that the air test "tend[ed] to affect in [some] way the outcome of [BNSF's] decision" to fire Mr. Rookaird. *Rookaird*, 908 F.3d at 461. |
| 8 | 19. | And because the air test affected Mr. Rookaird's termination, it was a contributing factor in an unfavorable personnel action alleged in Mr. Rookaird's complaint. |
| 11 | 20. | Because Plaintiff has met his burden, the burden shifts to BNSF. |

**C.   Substantive Stage – BNSF's Defense**

21. An employer can defeat a claim for unlawful retaliation if it can prove, by clear and convincing evidence, "that the employer would have taken the same unfavorable personnel action in the absence of the protected activity." *Rookaird*, 908 F.3d at 460 (alteration omitted) (quoting 49 U.S.C. § 42121(b)(2)(B)(iv)).

22. "Clear and convincing evidence requires greater proof than preponderance of the evidence. To meet this higher standard, a party must present sufficient evidence to produce 'in the ultimate factfinder an abiding conviction that [the asserted factual contentions are] highly probable.'" *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1020 (9th Cir. 2018) (alteration in original) (quoting *Sophanthavong v. Palmateer*, 378 F.3d 859, 866-67 (9th Cir. 2004)).

23. The Court concludes, by clear and convincing evidence, that absent the air test BNSF would have still fired Mr. Rookaird.

24. Mr. Rookaird was fired for many reasons unrelated to his inefficiency.

ORDER – 12

25. He was fired for gross dishonesty, having failed to sign his FRA tie-up timeslip and having falsely recorded his tie-up time. Dkt. # 465 at 170-73; Ex. 324; Dkt. # 423-3 at 6-7. BNSF believed that this dishonesty was significant because of its federal reporting obligations and the potential fines it could have incurred for failing to meet those obligations. Dkt. # 465 at 141, 165-66; Dkt. # 423-3 at 6-8.

26. Separately, Mr. Rookaird was fired for insubordination, having twice disobeyed BNSF assistant superintendent Stuart Gordon's commands to tie-up and go home. Dkt. # 465 at 76-77, 165, 170; Ex. 324; Dkt. # 423-3 at 8. Mr. Rookaird not only disobeyed Mr. Gordon's two commands but also started a heated argument with a coworker. Dkt. # 441 at 93, 97-98, 104; Dkt. # 466 at 62-63; Ex. 532 at 108.

27. Both gross dishonesty and insubordination were single, dismissible violations under the PEPA policy, which governed Mr. Rookaird's discipline. Dkt. # 465 at 75; Ex. 324; Ex. 546 at 7.

28. What is more, though the air test was a contributing factor in Mr. Rookaird's termination, the Court concludes that the test contributed very little.

29. To start, the test did not even account for all of Mr. Rookaird's supposed inefficiency on February 23, 2010. Mr. Rookaird and his crew were working for about five-and-a-half hours before they were called in. Yet the air test only accounted for about 20 to 40 minutes of those five-and-a-half hours. Dkt. # 441 at 77, 160.

30. In addition, no BNSF officer instructed Mr. Rookaird to stop the air test. Though he doubted the air test's necessity, trainmaster Dan Fortt never instructed Mr. Rookaird to stop the air test. Dkt. # 441 at 78-80, 160. Given that there was no attempt to stop the air test, this is yet more

ORDER – 13

evidence that the test played only a small part in BNSF's overall decision to fire Mr. Rookaird.

31. Further undermining the significance of the air test is its routine nature. At BNSF, air tests were conducted hundreds of times a day or more. Dkt. # 466 at 33. And Mr. Rookaird conducted air tests several times in the weeks leading up to February 23, 2010 without incident. *Id.* at 33-34. This also demonstrates that the test played only a small part in BNSF's overall decision to fire Mr. Rookaird.

32. Finally, Mr. Rookaird's two crew members, Mr. Webb and Mr. Belanger, performed the same air test as Mr. Rookaird but were not fired. They were not fired because, unlike Mr. Rookaird, they did not commit the single, dismissible violations that Mr. Rookaird committed. They were not insubordinate, and they did not improperly complete their tie-up timeslip. Dkt. # 465 at 171-72; Dkt. # 423-3 at 12-13. This further demonstrates that inefficiency and the air test—alone—would not have resulted in Mr. Rookaird's termination. It also demonstrates that, absent the air test, BNSF would have fired Mr. Rookaird anyway because of his gross dishonesty and insubordination.

33. In all, the Court forms the "abiding conviction" that even if Mr. Rookaird did not engage in the protected activity of refusing to stop the air test, BNSF would have still fired him for his gross dishonesty and insubordination. *OTR Wheel Eng'g*, 897 F.3d at 1020. Thus, the Court concludes that BNSF has successfully proved its defense by clear and convincing evidence.

34. The Court finds that BNSF is not liable for unlawful retaliation under the FRA.

ORDER – 14

## IV.  CONCLUSION

For the reasons previously stated, the Court finds in favor of BNSF on Plaintiff's unlawful retaliation claim.  The Clerk shall enter judgment for BNSF.

DATED this 28th day of March, 2022.

*[signature]*

The Honorable Richard A. Jones
United States District Judge

ORDER – 15